**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Katherine Bordallo AGUON, Defendant–Appellant.**

**No. 85–1318.**

United States Court of Appeals, Ninth Circuit.

Argued En Banc and Submitted Jan. 13, 1988.

Decided July 1, 1988.

Segundo Unpingco, Pacific Lawyers Group, San Jose, Cal., for defendant-appellant.

Karen Skrivseth, U.S. Dept. of Justice, Washington, D.C., and K. William O'Connor, U.S. Atty., District of Guam, Agana, Guam, for plaintiff-appellee.

Before GOODWIN, Chief Judge, and BROWNING, WALLACE, HUG, TANG, FARRIS, NELSON, NORRIS, REINHARDT, WIGGINS and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

A three-judge panel of this court reversed Aguon's convictions for extortion and conspiracy in violation of the Hobbs Act, 18 U.S.C. § 1951 and her convictions for making false statements before a grand jury and conspiracy to obstruct justice. *United States v. Aguon,* 813 F.2d 1413 (9th Cir.1987) (*Aguon I*). At the suggestion of the government, the case was taken en banc. 831 F.2d 1487 (9th Cir.1987).

Upon rehearing en banc, we are presented with three questions:

(1) whether we should retain the rule established in *United States v. McClelland,* 731 F.2d 1438 (9th Cir.1984), *cert. denied,* 472 U.S. 1010, 105 S.Ct. 2708, 86 L.Ed.2d 723 (1985), which held that "inducement" need not be proven in an extortion conviction when property obtained from another by a public official was obtained "under color of official right,"

(2) whether the jury instructions on *mens rea* were adequate, and (3) whether bias was established when a juror had previously committed an offense similar to the one being tried.

As did the three-judge panel, we reverse and remand to the district court. In doing so, we overrule *McClelland* because we conclude that proof of "inducement" is a prerequisite to conviction of extortion. As a separate ground for reversal of the Hobbs Act convictions, we adopt the panel's view that the *mens rea* instructions were inadequate. Contrary to the panel, we find no juror bias proven and therefore we affirm the non-Hobbs Act convictions.

While we adopt extensive portions of the three-judge panel's opinion, we modify it in several respects. Therefore, we withdraw the opinion of this court in *Aguon I* at 813 F.2d 1413 and replace it herewith.

I

*Extortion: The Jury Instructions*

The relevant facts and proceedings regarding the jury instructions on the extortion charge are taken verbatim from Judge Noonan's opinion in *Aguon I:*

Katherine B. Aguon, the defendant, was the Director of the Department of Education (DOE) of Guam between February 1980 and December 1982. A co-defendant was Pyong Hok Han, a Korean businessman, whose company, Hando Enterprises, Inc., was a vendor to DOE. Han testified that he gave Aguon dress-

es, a washing machine, a gas dryer, a microwave oven, and a refrigerator "to make her happy." He gave them without payment because "like I said, I'm vendor it's to me hard to ask money" and because "I don't want the people don't like my, don't like company to do business with DOE." He testified that he also bought a carpet selected by Aguon in Los Angeles and installed it in her house in Guam. He did this so he would have "no trouble" with his maintenance contract with DOE. Finally, he testified that he also put central air-conditioning in her home. The total value of these offerings was at least $8,500. Aguon was charged under Count Two of the indictment with having "knowingly and wilfully" committed extortion under 18 U.S.C. § 1951 in that she "did obtain and cause to be obtained" these goods, and she was convicted of that crime.[1]

At the beginning of the case before any evidence was introduced, the trial court read what it characterized as instructions "which go to the essential elements of the criminal conduct that is charged here" in order to give the jury "some feel for the nature of the case." The jury was told that the government had "to prove the case beyond a reasonable doubt." The jury was told that to prove extortion the government would have to prove that the defendant "caused or attempted to cause another to part with money or property by threatening to withhold official action unless he did so." The giving of preliminary instructions was well within the practice permitted by this circuit. *Manual of Model Jury Instructions for the Ninth Circuit* 29 (1985).

The court's instructions to the jury at the close of the case were that the government must prove beyond a reasonable doubt *"three essential elements"* in its case:

First, that the defendant *induced* another under color of official right to part with property.

Second, that she did so by *extortion as defined in these instructions.*

Third, that in doing so, interstate commerce was delayed, interrupted or adversely affected. [Italics supplied]

The court defined "wrongful" as "the obtaining of property by an alleged extortionist to which he has no lawful claim." "Therefore," the court said, proof "that the defendant obtained property under color of official right and that he was not lawfully entitled to this property" was "sufficient to establish that this property was wrongfully obtained by the defendant."

As to "color of official right," the court charged:

This type of extortion *does not* require proof of any specific acts on the part of the public official demonstrating force, threats, use of fear or *inducement.*

The wrongful use of otherwise valid official power converts dutiful action into extortion ...

*So long as the motivation for the payment focuses on the recipient's office,* the conduct falls within the ambit of Section 1951 of Title 18, United States Code. [Italics supplied]

We determine the adequacy of jury instructions by examining them in their entirety. *United States v. Feldman,* 788 F.2d 544, 555 (9th Cir.1986) [, *cert. denied,* — U.S. —, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987) ]. We review a district court's decision as to particular instructions for abuse of discretion. *Id.*

---

1. In relevant part 18 U.S.C. § 1951 reads:
   § 1951 Interference with commerce by threats or violence
   (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in

violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both....
   (b) As used in this section
   (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

## II

*Extortion: The Meaning of "Induced"*

We agree with the three-judge panel's conclusion that:

The instructions in this case were fundamentally flawed. First, in line with the court's "preliminary instructions," they told the jury that the defendant had to "induce" the payment. Then the instructions told the jury that no proof of acts demonstrating "inducement" was necessary. The government now argues that the instruction requiring proof of inducement was more favorable to the defendant than the law required, so she lost nothing in having the instruction canceled by the later instruction. But the instructions are contradictory. The difficulty with contradictory instructions is the confusion they must have generated in the jury. Did it matter whether the payments were induced or not induced? The jury was left without guidance on this question.

The *Aguon I* opinion suggests a reason for the confusion in the trial court's instructions:

We have construed the Hobbs Act not to require inducement by the government official.... *McClelland*, 731 F.2d [at] 1440 [citation omitted]. The court has observed that the statutory definition of extortion is in the disjunctive: "induced by wrongful use of actual or threatened force, violence, or fear, *or* under color of official right" (emphasis supplied). This construction of the Hobbs Act is concurred in by almost all other circuits. *Id.* at 1439. This court has held that violations of the Hobbs Act "may be proved by demonstrating nothing more than that the payment in question was obtained 'under color of official right.'" *Id.* at 1440.

■ But here we must part company with the analysis of *Aguon I.* As Judge Haynsworth stated, and we agree, "[t]he meaning of '*induced ... under color of official right*' is the question in this case." *United States v. Paschall*, 772 F.2d 68, 71 (4th Cir.1985) (emphasis supplied), *cert. denied*, 475 U.S. 1119, 106 S.Ct. 1635, 90 L.Ed.2d 181 (1986). To answer this question we shall examine the grammatical construction, plain meaning, legislative history, and judicial interpretation of the Hobbs Act.

## A

*Grammatical Construction*

In *United States v. Hathaway*, 534 F.2d 386, 393 (1st Cir.), *cert. denied*, 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976), the First Circuit focused on the disjunctive nature of the statutory definition of "extortion" at 18 U.S.C. § 1951(b)(2) and particularly emphasized the use of the word "or" preceding the last phrase, "under color of official right." Our court in *McClelland* purported to follow this reasoning and concluded that inducement need not be shown in a Hobbs Act prosecution of a public official. *McClelland*, 731 F.2d at 1440. But, in a very recent post-*Hathaway* opinion, the First Circuit states the disjunction more accurately: "[w]e have interpreted the definition in the disjunctive, finding that the prosecution can establish a violation by showing that a defendant induced payment *either* through use of actual or threatened force, violence or fear, *or* under color of official right." *United States v. Bucci*, 839 F.2d 825, 827 (1st Cir., 1988) (emphasis in original). We believe that the First Circuit's newly added emphasis on the word "either" is consistent with our view of statutory construction.

Upon close grammatical analysis, it appears that, correctly parsed, the verb "induced" is modified by two prepositional phrases: "by wrongful use of actual or threatened force, violence, or fear," and "under color of official right." Both prepositional phrases modify the one verb, "induced." An accurate grammatical reading is that several methods of inducement are permitted by the Act. The prepositions "by" and "under" are parallel. The prepositional phrases have a parallel disjunctive function in modifying "induced." Only "induced" payments are thus proscribed. *See* Comment, *Prosecuting Public Officials Under the Hobbs Act: Inducement as an*

*Element of Extortion Under Color of Official Right,* 52 U. Chi. L.Rev. 1066, 1087 (1985).

We are persuaded that our *McClelland* court, in focusing on the disjunctive construction of the prepositional phrases, failed to consider the significance of the verb such phrases modified. While the grammatical analysis may not be entirely dispositive, we are convinced that proper interpretation of the Hobbs Act cannot ignore the original statutory command that the alleged activity must "induce" the alleged payment.

## B

### *Plain Meaning of "Induced"*

The ordinary meaning of "induce" is "to move and lead (as by persuasion or influence)." *Webster's Third New International Dictionary* (1986). *Black's Law Dictionary* (5th ed. 1979) defines "induce": "To bring on or about, to effect, cause, to influence to an act or course of conduct, lead by persuasion or reasoning, incite by motives, prevail on."

All definitions of "induce" are active. Something is done. The payee must have done something to activate the payor.

In construing the statute we begin with the premise that Congress meant each word it incorporated into a definition to have meaning. "Legislative words presumably have meaning and so we must try to find it.... And so we assume that Congress uses common words in their popular meaning, as used in the common speech of men." Frankfurter, *Some Reflections on the Reading of Statutes,* 47 Col.L.Rev. 527, 534, 536 (1947).

The background and legislative history of the Hobbs Act support the conclusion that Congress, in defining the elements of the crime, intended the extortionist to have more than an inert role in the transaction.

## C

### *Historical Background and Legislative History*

The validity of our analysis is reinforced by Judge Noonan's development of histori-cal background and legislative history in *Aguon I:*

The ancient phrase "under color of official right" (the equivalent of *ex colore officii* ) had a distinct meaning at common law. It meant "an act badly done under the countenance of an office" under "a dissembling visage of duty." *Dive v. Maningham,* 75 Eng.Rep. 96, 108 (Common Pleas, 1550). Without amplification the phrase is used by Blackstone to define extortion. 4 *Commentaries on the Laws of England* (1765) 141 ("any officer's unlawful taking, by color of his office, from any man, any money or value that is not due to him, or more than is due, or before it is due.").

As applied at common law in the United States the phrase "by or under color of office or official right" was construed to mean that the official made a demand. If money was paid voluntarily, it was not obtained by the officer "by color of his office." *See, e.g., Commonwealth v. Dennie, Thacher's Criminal Cases* (Boston Mun.Ct.1827) 165. "Demand" on the part of the payee, "unwillingness on the part of the payor, were correlative". The ordinary meaning of "to extort" is "to obtain from an unwilling person." This ordinary meaning was preserved by the interpretation the courts gave to "color of office." *See LaTour v. Stone,* 139 Fla. 681, 190 So. 704 (1939) and the authorities cited therein; *Daniels v. United States,* 17 F.2d 339 (9th Cir.), cert. denied, 274 U.S. 744, 47 S.Ct. 591, 71 L.Ed. 1325 (1927).

Some courts insisted that there must be an express request for payment by an official before he could be guilty of extortion. *E.g., United States v. Harned,* 43 F. 376 (D.Wash.1890). Other courts found demand in a course of conduct that conveyed the official's messsage to his victim. *E.g., Commonwealth v. Wilson,* 30 Pa.Super. 26 (1906). However subtly the official communicated, a demand was what was necessary to constitute common law extortion. *See* Comment, *"United States v. Mazzei: Hobbs Act Extortion Under Color of Official*

*Right"* 62 Va.L.Rev. 439, 441 (1976) (common law extortion consisted of "corruptly demanding").

Congress has used the terms "extort" or "extortion" in a variety of statutes without any indication of an intention to eliminate the common law requirement of demand. *E.g.*, 18 U.S.C. § 875 (transmission with intent to extort); 18 U.S.C. § 876 (mailing with intent to extort); 18 U.S.C. § 872 (extortion by federal officials). This last statute makes it a crime for any officer of the United States "under color of his office" to commit "extortion." As the statute uses a term already contained in the common law meaning of extortion, it has been reasoned that Congress must have meant to require more—the commission of official acts which brought pressure on the one subject to them. *United States v. Sutter*, 160 F.2d 754 (7th Cir.1947). The statute, so interpreted, does not abandon the common law requirement of a demand, but rather, emphasizes its necessity for proof of commission of the crime.

We find it particularly significant that the word "induced" is common to the extortion definition in the Hobbs Act and two source statutes. The New York Penal Code of 1909 defined extortion as the "obtaining of property from another, ... with his consent, *induced* by a wrongful use of force or fear, or under color of official right." N.Y. Penal Law § 850 (1909), *as amended*, 1917 N.Y. Laws 1545 (emphasis supplied). This definition had been carried forward from the proposed 1864 Penal Code which was not enacted until 1881. *See* Commissioners of the Code *The Penal Code of the State of New York* tit. XV ch. VI § 613 at 220 (1864); N.Y. Penal Code tit. XV ch. V § 552 at 139 (1881).[2]

The Anti–Racketeering Act of 1934 defined extortion as: "[o]btains the property of another, with his consent, *induced* by wrongful use of force and fear, or under color of official right...." 48 Stat. 979, 980 (1934) (emphasis supplied).

As pointed out in *Aguon I*, the latter statute:

> was amended in 1946 by the Hobbs Act, where extortion was defined in terms of these prohibited acts: "the term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). Congressman Hobbs said explicitly that the definitions of robbery and extortion were modeled on the New York Penal Code. 91 Cong.Rec. 11,900 (1945). Other congressmen observed that the congressional definitions were in harmony with the understanding of extortion in all of the states, 89 Cong.Rec. 3205 (1943) (statement of Rep. Graham); 91 Cong. Rec. 11,906 (1945) (statement of Rep. Robsion).... When "Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word...." *Morissette v. United States*, 342 U.S. 246, 263 [72 S.Ct. 240, 250, 96 L.Ed. 288] (1952).

■ It is a well-established principle of statutory construction that when one jurisdiction adopts the statute of another jurisdiction as its own, there is a presumption that the construction placed upon the borrowed statute by the courts of the original jurisdiction is adopted along with the statute and treated as incorporated therein. *Tucker v. Oxley*, 9 U.S. (5 Cranch) 34, 42, 3 L.Ed. 29 (1809); *Vela v. Government Employees Insurance Company*, 395 F.2d

---

**2.** As the dissent points out, David Field's commentary to his 1864 proposed N.Y.Penal Code definition of extortion (§ 613) refers us to *People v. Whaley*, 6 Cow. 661 (1827), which affirmed the extortion conviction of Judge Whaley. The dissent fails, however, to provide the context for its quoted extract:

> Extortion signifies, in an enlarged sense, any oppression under color of right. In a stricter sense, it signifies the taking of money by any officer by color of his office ... [Whaley] received and demanded the money by color of his office, with the corrupt intent charged in the indictment. These facts being proved, the offense was complete.

*Id.* at 663, 664. Contrary to the dissent, demand ("demanded the money") was expressly required as far back as 1827.

437, 439 (9th Cir.1968). At the time the Hobbs Act was passed, New York law had explicitly recognized the distinction between extortion and bribery, and the need to prove inducement as an element of the former. *See, e.g., Hornstein v. Paramount Pictures,* 22 Misc.2d 996, 1002–04, 37 N.Y.S.2d 404, 412–13 (N.Y.Sup.Ct.1942), *aff'd,* 266 A.D. 659, 41 N.Y.S.2d 210 (1943), *aff'd,* 292 N.Y. 468, 55 N.E.2d 740 (1944); *Simpson v. Coastwise Lumber & Supply,* 239 N.Y. 492, 498–500, 147 N.E. 77, 79 (1925). The New York Code also had a separate statute prohibiting the crime of "oppression," defined as the misuse of public office by act rather than by threat. N.Y. Penal Law § 854 (1909); *see also New York v. Learman,* 261 A.D. 748, 752, 28 N.Y.S.2d 360, 364 (1941). That the New York Code of the time so recognized and distinguished the similar crimes of bribery, extortion,[3] and oppression, but required inducement only for the crime of extortion, is strong evidence that Congress also intended to require inducement as an element for conviction under the Hobbs Act.

As stated in *Aguon I:*

Courts are not to create new crimes by changing the accepted meaning. [*See Morissette,* 342 U.S. at 263, 72 S.Ct. at 250]. If the core common law concept is abandoned, the meaning of extortion becomes uncertain. The statute is "set adrift upon a sea of prosecutorial discretion" and "becomes unconstitutionally vague." *United States v. Mazzei,* 521 F.2d 639, 655 (3d Cir.) (en banc) (Gibbons, J. dissenting), *cert. denied,* 423 U.S. 1014 [96 S.Ct. 446, 46 L.Ed.2d 385] (1975). Judge Gibbons' fears were not idle. The Second Circuit was informed by the United States Attorney for the Eastern District of New York in 1983 that the "Hobbs Act may be viewed as enacting a special code of integrity for public officials" although that "as a matter of prosecutorial discretion" ambiguous de minimis conduct by public officials would not be prosecuted. *United States v. O'Gra-*

*dy,* 742 F.2d 682, 694 (2d Cir.1984). As that court pointed out, rejecting this interpretation of the statute, the fact that ambiguous conduct could be prosecuted was alien to basic concepts of criminal justice. *Id.; see also* Comment, [52 U.Chi.L.Rev. at 1087].

The government's construction of the Hobbs Act equates it with the federal statute commonly called "the anti-gratuities statute," 18 U.S.C. § 201(g) [1962]. Under this statute a federal official who receives money "for or because of any official act performed or to be performed" is subject to imprisonment for two years. Under the Hobbs Act any public official, federal or state, is subject to imprisonment of twenty years. The enactment of the antigratuity statute in 1962 was "a clear indication that Congress did not believe that the Hobbs Act prohibits such conduct." *O'Grady,* 742 F.2d at 691. The enactment of the antigratuity statute, which deliberately eliminates common law concepts, is also a clear indication that Congress did not intend to eliminate the common law core when in the Hobbs Act it employed the common law phrase "under color of official right."

There has been development under the statute as to proof of demand by an official—a development by modern case law consistent with the common law core. Demand may be proved not by the words of the defendant but by the custom of the system in which the official operates. *E.g., United States v. Kenny,* 462 F.2d 1205 (3d Cir.) (Gibbons, J.), *cert. denied,* 409 U.S. 914 [93 S.Ct. 233, 34 L.Ed.2d 176] (1972). The Kenny machine, long-entrenched, had established a system whereby "no one could do business" with Jersey City or Hudson County without a kickback, usually 10 percent, of the contract price. At the head of this system was the boss who held no official or party position, yet controlled everything. In this system, the office-

---

**3.** That demand is implicit in the concept of extortion is also illustrated by N.Y.Penal Law § 855 (1909) (formerly N.Y.Penal Code § 557 (1881)), which the dissent quotes (in part) at

1181, *infra.* Why would someone pay an illegal fee in excess of the statutory amount other than in response to some form of demand having been made?

holders did not have to make individual demands for the money. A "thoroughly meshed arrangement" produced the kickbacks for Kenny. *Id.* at 1211. Demand for payment was built in.

Not surprisingly, Judge Noonan's analysis is consistent with the history of this subject set forth in the recognized authority in the field: Noonan, *Bribes*, 564–91 (1984).

### D

### *Judicial Construction*

We find ourselves in accord with the Second Circuit's conclusion that inducement is an element required for conviction under the Hobbs Act. We note with approval that the Second Circuit has analyzed the facts of cases in which other courts of appeals have explicitly rejected the necessity of proof of inducement and concluded that "the facts of those cases, and of most reported decisions construing extortion under color of official right, establish conduct from which inducement can readily be inferred." *O'Grady*, 742 F.2d at 689. Writing for the Seventh Circuit, Judge Posner noted: "There is an air of the academic about this intercircuit conflict because, as a matter of fact, in none of the cases in which the issue has been pressed was the official passive...." *U.S. v. Holzer*, 816 F.2d 304, 311 (7th Cir.), *vacated*, —— U.S. ——, 108 S.Ct. 53, 98 L.Ed.2d 18 (1987), *aff'd in part on remand*, 840 F.2d 1343 (1988).

In our pre–*McClelland* holdings we have found sufficient evidence of inducement without questioning whether inducement was an essential element under the Hobbs Act. *See United States v. Gates*, 616 F.2d 1103, 1106 (9th Cir.1980); *United States v. Phillips*, 577 F.2d 495, 500–01 (9th Cir.), *cert. denied*, 439 U.S. 831, 99 S.Ct. 107, 58 L.Ed.2d 125 (1978). Indeed, "inducement can take many forms, some more subtle than others. Proof of a request, demand or solicitation, no matter how subtle, will establish wrongful use of public office." *O'Grady*, 742 F.2d at 691.

Thus, we are persuaded to adopt the reasoning of *O'Grady* in its main points which, as suggested by *Aguon I*, are:

[T]hat the Hobbs Act punishes a fundamentally different offense than the anti-gratuities statute, [*O'Grady*,] 742 F.2d at 691; that proof of actions under color of office is essential to proof of the crime, *id.* [at 689]; and that in short, "this offense requires the jury to find that the public official did something, under color of his office, to cause the giving of benefits." *Id.* at 693.

The government is free to prove that a system was in place in the Department of Education in Guam such that no words were necessary for Aguon to utter to get a payoff. The government did prove at the trial that Granich and Camacho were so regularly paid off by Han that no repetition of demands was necessary by them: a system as to them was in place and at work. But in the case of Aguon, who came into office after Granich and Camacho had embarked on extortion, the evidence of a system of which she was aware was different. Nevertheless, the government may be able to show that Aguon was part of a system whose customary operation demanded that a share go to the head honcho....

The instruction, "So long as the motivation for the payment focuses on the recipient's office, the conduct falls with the orbit of Section 1951 of Title 18" is not erroneous if properly qualified by surrounding language making a correlation between the payor's motivation and the payee's conduct. *See United States v. Scacchetti*, 668 F.2d 643 (2d Cir.), *cert. denied*, 457 U.S. 1132, 102 S.Ct. 2957, 73 L.Ed.2d 1349 (1982). No such language qualified the instruction here.

We hold that proof that the defendant "induced" the improper payment is an essential element in the crime of extortion and that "inducement" can be in the overt form of a "demand," or in a more subtle form such as "custom" or "expectation" such as might have been communicated by the nature of defendant's prior conduct of his office. Reliance on a system of expecting payments in exchange for public favors can itself be the necessary act of inducement if the public official previously establishes or acquiesces in the system and if the donor is sufficiently aware of the ex-

pectation created by prior acts of extortion. Accordingly, the jury instructions must incorporate inducement, which may be explicit or implicit, as a required element of the crime of extortion under the Hobbs Act.

■ Perhaps an observation on the distinction between bribery and extortion in the federal law is warranted. Bribery is committed by both the bribe giver and the recipient; extortion is only committed by the recipient. Bribery and extortion will still overlap in some situations. As Judge Aldisert noted:

At their tangent, the offenses of bribery and extortion may both arise out of the same nucleus of operative facts. A public official who corruptly accepts an unauthorized fee for the performance of his official duty may be guilty of both bribery and extortion. At the opposite extreme, however, the offenses bear little resemblance.

*United States v. Cerilli*, 603 F.2d 415, 435 (3d Cir.1979) (Aldisert, J., dissenting), *cert. denied*, 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 728 (1980). Under modern federal law, a public official's inducement of a payment of money for performance of a public act is bribery. *See* 18 U.S.C. § 201. Such conduct by a public official is also extortion under the Hobbs Act, 18 U.S.C. § 1951(b)(2). But there is a difference. If the official accepts the payment to perform a public act, it is bribery under section 201; however, if the payment is not induced, it can still be bribery but not extortion under the Hobbs Act.

The distinction is reasonable. Until a 1965 statutory change, New York law accepted extortion as a defense to a charge of bribery. *People v. Dioguardi*, 8 N.Y.2d 260, 203 N.Y.S.2d 870, 881–82, 168 N.E.2d 683, 692 (1960).[4] Indeed, as Judge Aldisert explains:

A public official charged with extortion under the Hobbs Act should be able to argue that although he did in fact receive

something of value, it was given at the initiative of the donor, and not as a result of force, fear or duress emanating from the defendant. Thus, in an indictment for extortion, it is logically and jurisprudentially sound to permit a defense of bribery. To hold otherwise is to blur completely the distinction between the two crimes.

*Cerilli*, 603 F.2d at 435 (Aldisert, J., dissenting). The distinction makes sense also because it may be more objectionable for an official to coerce or to demand and thereby to obtain money than for an official to succumb to temptation in accepting money offered him. Public officials who tell members of the public that favors are for sale commit a more serious offense than those who accept unsolicited payments. Under *McClelland*, a prosecutor could convert a less serious offense, bribery, in which the recipient did no more than accept payment initiated by the bribe-giver, into a more serious offense, extortion, in which conviction could result in a ten-times greater punishment. Prosecutorial discretion should not be permitted to go that far. Stated another way, "when there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language." *McNally v. United States*, — U.S. —, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987).

Because we are persuaded that our previous analysis of the extortion statute fails to evaluate properly its common law background and more recent developments in legal scholarship, we hereby overrule *McClelland* to the extent it is inconsistent with our conclusions in this opinion.[5]

### III

### *Extortion: Role of Mens Rea*

■ We agree with Judge Noonan in *Aguon I* that the instructions on *mens rea* were inadequate:

**4.** The defense is still available to the bribe-giver. *See* N.Y.Penal Law § 200.05 (McKinney 1975) and Hechtman, A. *Practice Commentaries* at 418.

**5.** Like the Lorelei, the dissent echoes and re-echoes the theme that prudential *stare decisis*

should prevent us from overruling *McClelland.* We resist the lure of this siren song. The province and obligation of the *en banc* court is to review the current validity of challenged prior decisions.

The government on appeal argues that *mens rea* was implicit in the court's use of "wrongful." But the court's own definition of the term negates this argument. The court told the jury that the defendant obtained property wrongfully if it was "obtained under color of official right" and she was "not lawfully entitled to this property." This statement of the elements of the crime was incomplete. Intention was omitted. A homely example will illustrate the deficiency. A judge taking a colleague's robe by mistake does so under color of official right and he is not lawfully entitled to the robe. The taking is wrongful. But it is no crime: the judge acts without *mens rea*.

One searches the instructions on extortion almost in vain for any instructions enlightening the jury on *mens rea*. One finds:

It is not necessary for the government to show that the defendant actually intended to delay, obstruct or affect interstate commerce.

Thus the jury was told what intention the government need not prove. It was not told what intention the government must prove. The general instruction that was given, "You may consider it reasonable to draw the inference and find that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted," has no bearing on the specific intention to commit the crime with which Aguon was charged.

Criminal intent was a necessary element that the government had to prove. No act standing alone is a crime under the Hobbs Act. A guilty mind has to be proved as well as a wrongful deed. In an historic opinion, Justice Jackson, the ... international prosecutor of the misdeeds of a regime without any respect for individual rights, vindicated this regular requirement of Anglo–American criminal law as "no provincial or transient notion." Invoking William Blackstone, Roscoe Pound and Max Radin, and writing for the Court, Justice Jackson found *mens rea* a cornerstone of our criminal jurisprudence. As he observed, "the intense individualism" of Americans had set this element deep within our criminal law. *Morissette,* [342 U.S. at] 251–53 [72 S.Ct. at 243]. Justice Jackson drew the clear corollary: the question of intent must be submitted to the jury. *Id.* at 274 [72 S.Ct. at 255].

*A fortiori,* criminal intent must be submitted to the jury in a case charging extortion under the Hobbs Act. "Willful" or "corrupt" were the common law terms focusing on and emphasizing the specific intention the extortionist must be shown to have.... The corrupt intention must be proved to prove the crime. The court's failure to give an instruction on a vital element of the crime was plain error. A miscarriage of justice would result if the error was passed over as harmless. *United States v. Young,* 470 U.S. 1, 15–16, [105 S.Ct. 1038, 1046–47, 84 L.Ed.2d 1] (1985).

The confusing instructions on inducement, on motivation, and on color of official right, ... and the lack of an instruction on specific intent require reversal of Aguon's conviction on Count Two.

Count Three charged Aguon and co-defendants Frank Granich and Ike Camacho with extortion in obtaining and causing to be obtained $42,000 from Kelly Song. Granich was the Supervisor of Buildings and Grounds of DOE. Camacho was the Business Administrator. Song, doing business as K.S. Enterprises, Inc., obtained a contract to paint the JFK school. Granich, confronted by a government tape recording of a conversation between Song and himself, decided to cooperate with the government. He testified that Song paid him $35,000 in cash to get the contract and that he, Granich, gave $15,000 of this amount to Camacho and $5,000 or $7,000 to Aguon.

Granich testified that he gave the $5,000 or $7,000 to Aguon in two cash installments. He characterized the first amount when he gave it to her with these words: "This is a political contribution for you." The second installment he delivered at a political meeting for the

re-election of Governor Calvo. At neither time did he tell Aguon that the money came from Song.

No instruction was given the jury on the meaning of "under color of official right." *Mens rea,* which had to be proved if receipt of political contributions was to be converted into extortion, was never set before the jury. Plain error was committed. The conviction on this count must also be reversed.

### IV

*Conspiracy to Extort. The Jury Instructions*

■ We adopt Judge Noonan's treatment of the conspiracy issue in *Aguon I.*

Count One charged Aguon, Granich, Han, Song and several other employees of DOE and private contractors with conspiring "to commit extortion" under 18 U.S.C. § 1951. The overt acts in furtherance of the conspiracy alleged to have been committed by Aguon were the receipt of Han's offerings and the cash from Song.

In the court's "preliminary instructions" before the introduction of evidence, the court explained the elements of conspiracy in terms of the general conspiracy statute, 18 U.S.C. § 371. A jury listening to these instructions would have gathered that Aguon was being tried under the general conspiracy statute not under the much more specific "conspiracy to commit extortion" statute. Despite the language of the indictment, the more general statute was alone the focus.

In the court's final instructions to the jury the court gave an instruction on conspiracy which covered conspiracy to commit extortion under the Hobbs Act, conspiracy to commit mail fraud and conspiracy to obstruct justice. The court declared, "The following instruction on conspiracy applies to both counts." The court then quoted the language of the general conspiracy statute, 18 U.S.C. § 371: "If two or more persons conspire ... to commit any offense against the United States...." The court continued

with instructions applicable to the general conspiracy statute.

After about five pages of instruction on the general law of conspiracy, the court said:

The defendant may be found guilty of the crimes of conspiracy to extort in Count 1, extortion in Count 3, and fraud in Counts 13 and 14, and the conspiracy to obstruct justice in Count 37, even if the defendant personally did not do the acts but aided and abetted in their commission.

The conspiracy instruction also included the instruction that the government must show that the defendant had "wilfully" become a member of the conspiracy. *Mens rea* as to conspiracy was adequately dealt with by this instruction.

At no point in the instruction, however, did the court state that "conspiracy to extort" with which Aguon was charged is a crime under 18 U.S.C. § 1951. The jury was given no inkling of this particular crime. Conspiracy to obstruct justice and conspiracy to commit mail fraud were treated as identical with conspiracy to extort, as though all three crimes of conspiracy were offenses under 18 U.S.C. § 371. The general conspiracy statute, for whose violation Congress has provided a maximum penalty of five years, was not distinguished from the relevant statute, whose violation carries with it a maximum penalty of twenty years. The confusion of the two statutes in the instruction of the court was plain error.

In addition, as the jury had been erroneously instructed on the crime of extortion, there was substantial prejudice to the defendant on the charge of conspiracy to extort—prejudice that spilled over from the instruction on extortion. Believing that it could convict on extortion without corrupt intent, the jury may well have concluded that the extortion Aguon was convicted of under Counts Two and Three was evidence of her participation in the conspiracy under Count One. Facing conviction on three crimes all charged under 18 U.S.C. § 1951, Aguon was entitled to a jury not affected by

error as to two of the three Hobbs Act crimes. Viewing the jury instructions as a whole and evaluating the adequacy of the entire charge, *United States v. Frazin*, 780 F.2d 1461, 1468 (9th Cir.1986) [cert. denied, 479 U.S. 844, 107 S.Ct. 158, 93 L.Ed.2d 98] we hold that the court committed plain error in the instructions on Counts One, Two and Three. We reverse the conviction on each of these counts.

## V

### *The Impartiality of the Jury*

Aguon moved for a new trial alleging lack of an impartial jury and appeals the denial of that motion. We review the denial of a motion for a new trial for abuse of discretion. *United States v. Shaffer*, 789 F.2d 682, 687 (9th Cir.1986).

■ Aguon contends that because Robert San Nicholas, a juror in her case, pleaded guilty on October 3, 1985 to a charge similar to the one against her—of taking kickbacks in connection with the letting of paving contracts—that he was not an impartial juror. The charge to which he pleaded guilty was a misdemeanor, a crime under the local laws of Guam, not a federal felony.

In ruling on whether a juror's response or failure of response at voir dire rises to constitutional prejudice that necessitates a new trial, we are governed by *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984): "To obtain a new trial ... a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

San Nicholas was not asked if he was under investigation at voir dire or if he had been investigated. He was not questioned about whether he had ever been involved in a situation similar to Aguon's, or was relat-ed to anyone who had been. The jury was asked only the general question whether anyone knew of any reason why he or she might not be able to be fair to both sides. There is no evidence of prejudice against Aguon. There is no showing that San Nicholas failed to answer honestly a material question. There is no evidence that at the time he was impaneled he knew he was under investigation, nor is there evidence of either his actual prejudice against Aguon or words or actions that would show he might be prejudiced.

■ With respect to jurors other than San Nicholas, we adopt the panel's findings in *Aguon I:*

The defendant claims that three other jurors besides San Nicholas were biased against her. No significant bias appears. Juror Buentipo was unaware that his cousin's wife had been fired by the defendant's family. Juror Borja was no longer the niece by marriage of prosecution witness Frank Granich; Granich had divorced her aunt. Juror White, as she explained at voir dire, was a friend of one of the co-defendants, Pazita Camacho, but Camacho was not on trial, having pled guilty. The acceptance of these jurors was well within the court's discretion. *United States v. Hendrix*, 549 F.2d 1225 (9th Cir.), *cert. denied*, 434 U.S. 818, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977).

## VI

### *Other Issues*

■ We agree with the panel in *Aguon I* with respect to additional issues on appeal:

We do not find merit in the other issues raised by Aguon but for guidance in the event of a new trial we rule on them.

The Fourth Amendment, Aguon contends, was violated when two federal agents interviewed her. The meeting was in her office. It was held by appointment. This is no indication that she was not free to leave any time she wished. Aguon was not seized.

Aguon also urges that Granich, acting as a government agent, entrapped her into the conspiracy to obstruct justice. Concealment by her of her unauthorized access to the draft audit report alone suffices to bar any finding of entrapment as a matter of law. *United States v. Chen*, 754 F.2d 817, 821 (9th Cir.), *cert. denied*, [471 U.S. 1139,] 105 S.Ct. 2684, 86 L.Ed.2d 701 (1985). Moreover, the question of entrapment was properly submitted to the jury, which failed to accept this defense.

Alternatively, Aguon argues that the government's use of Granich denied her due process. Granich played the ignominious role of a tempter who led Aguon on, but his protracted part as a "wired" informant was not "so grossly shocking and so outrageous as to violate the universal sense of justice." [citation omitted]. *United States v. Ryan*, 548 F.2d 782, 789 (9th Cir.1976), *cert. denied*, 430 U.S. 965, 97 S.Ct. 1644, 52 L.Ed.2d 356 (1977); *United States v. Bagnariol*, 665 F.2d 877, 883 (9th Cir.1981), *cert. denied*, 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982).

Aguon objects to references by the prosecuting attorney to her political activity. On direct examination Aguon herself had discussed her political activity at length. Her political involvement was germane to her defense. Considering the effect of the prosecutor's remarks in the context of the entire trial, *United States v. Patel*, 762 F.2d 784, 795 (9th Cir.1985), and in light of similar remarks made on the defendant's behalf, *see* [*Young*, 470 U.S. at 1–38, 105 S.Ct. at 1038–58], we find that those remarks did not deprive Aguon of a fair trial. The same conclusion must be reached as to the prosecution's reference to the guilty pleas of her co-defendants. The closing argument of Aguon also mentioned these pleas. The prosecution's reference did not deprive her of a fair trial. *Id.*

Aguon complains of the court's exclusion of her expert on psycholinguistics, who would have testified about the taped conversations with Granich. While such testimony might have assisted the trier of fact, Fed.R.Evid. 702, the trial court has broad discretion to admit or exclude expert testimony. *United States v. Gann*, 732 F.2d 714 (9th Cir.), *cert. denied*, [469 U.S. 1034] 105 S.Ct. 505, 83 L.Ed.2d 397 (1984). We have repeatedly upheld the exclusion of psycholinguistic expert testimony, *United States v. Hearst*, 563 F.2d 1331, 1349–50 (9th Cir. 1977), *cert. denied*, 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 40 (1978); *United States v. Schmidt*, 711 F.2d 595, 599 (5th Cir.1983), *cert. denied*, 464 U.S. 1041 [104 S.Ct. 705, 79 L.Ed.2d 169] (1984); *United States v. Kupau*, 781 F.2d 740, 745 (9th Cir.)[, *cert. denied*, [479 U.S. 823] 107 S.Ct. 93 [93 L.Ed.2d 45] (1986)]. There was no abuse of discretion by the trial court in excluding the proffered testimony.

. . . .

The defendant observes that the court violated Rule 24 of the Federal Rules of Criminal Procedure by not designating which two of the fourteen jurors were alternates until the start of deliberations, when the "additional" jurors were duly discharged. Absent the consent of the parties, we discourage this unauthorized deviation from standard procedure, *see United States v. Viserto*, 596 F.2d 531 (2d Cir.), *cert. denied*, 444 U.S. 841, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979); but the defendant has presented no scenario in which this procedure could have prejudiced her. The court's error was harmless. Fed.R.Crim.P. 2, 52(a); *see United States v. Phillips*, 664 F.2d 971, 992–93 (5th Cir.1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982).

Aguon also finds objectionable the court's transmission to the jury of a list of the exhibits taken into the jury room. This ministerial act, to which counsel raised no objection beforehand, posed an insignificant risk of prejudice compared to direct, substantive communication between judge and jury, *see United States v. United States Gypsum Co.*, 438 U.S. 422, 460, 98 S.Ct. 2864, 2884–85, 57 L.Ed. 2d 854 (1978); *United States v. Artus*,

591 F.2d 526 (9th Cir.1979). In these circumstances, no formal hearing was warranted. *United States v. Diggs*, 522 F.2d 1310 (D.C.Cir.1975), *cert. denied*, 429 U.S. 852, 97 S.Ct. 144, 50 L.Ed.2d 127 (1976).

A broader argument by the defendant is that the conduct of her trial counsel deprived her of the effective assistance of counsel, in violation of the Sixth Amendment. Specifically Aguon argues that trial counsel should have raised several of the objections disposed of above, sought a change of venue, and moved for dismissal on grounds of selective prosecution. The defendant must rebut "the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ..." *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). Our disposition of the various objections above suggests that the failure to raise them was not prejudicial. As for change of venue, the trial judge did discuss with counsel the issue of pretrial publicity, but counsel for the defendant, *after consulting with her*, stipulated that the jury was satisfactory. The effectiveness of trial counsel must be evaluated in light of the client's conduct. *Id.* at 691 [104 S.Ct. at 2066]. A selective-prosecution claim would appear to have had little chance for success, as defendant would have had to show both discriminatory purpose and discriminatory effect to establish a violation of equal protection. *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985).

Aguon had able representation. Her counsel's conduct was far from preventing "the proper functioning of the adversarial process...." *Strickland, supra*, 466 U.S. at 686, 104 S.Ct. at 2064. In fact, as a result of her counsel's development of her defense at trial and post-trial

hearing, as well as thanks to the efforts of her different counsel on appeal, Aguon is entitled to a new trial.

## VII

### *Conclusion*

We hold that inducement and *mens rea* are essential elements of the crime of extortion under the Hobbs Act, neither of which was properly communicated to the jury. Accordingly, we reverse Aguon's three Hobbs Act convictions and remand for further proceedings consistent with this opinion.

Since we find that no juror bias was proven, and for other reasons stated, Aguon's other two convictions on non-Hobbs Act charges are affirmed.

AFFIRMED IN PART, REVERSED IN PART and REMANDED.

REINHARDT, Circuit Judge, joined by Circuit Judge NELSON, concurring:

I join in the excellent opinion Judge O'Scannlain has written for the court, and write separately only to respond to some of the arguments in Judge Wallace's concurrence and dissent ("dissent").

The dissent argues that considerations of *stare decisis* require us to stand by the interpretation of the Hobbs Act previously offered by a panel of this court in *United States v. McClelland*, 731 F.2d 1438 (9th Cir.1984) (per curiam). Judge Wallace relies on language from a series of Supreme Court decisions.[1] In those cases the Court noted that *its* adherence to *its* prior decisions was particularly warranted in matters of statutory interpretation since any error it made in past opinions could be "corrected" by congressional action. *But see Patterson v. McLean Credit Union*, —— U.S. ——, 108 S.Ct. 1419, 99 L.Ed.2d 879 (1988) (Supreme Court's *sua sponte*

**1.** *Square D Co. v. Niagara Frontier Tariff Bureau*, 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986); *NLRB v. International Longshoremen's Association*, 473 U.S. 61, 105 S.Ct. 3045, 3058, 87 L.Ed.2d 47 (1985); *Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 2434 n. 5, 85 L.Ed.2d 791 (1985); *Thomas v. Washington Gas Light Co.*, 448 U.S. 261, 272, 100 S.Ct. 2647, 2656, 65 L.Ed.2d 757 (1980); *Busic v. United States*, 446 U.S. 398, 404–05, 100 S.Ct. 1747, 1752, 64 L.Ed.2d 381 (1980); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736, 97 S.Ct. 2061, 2069, 52 L.Ed.2d 707 (1977).

decision to reconsider the statutory interpretation of a case decided twelve years earlier); *see also id.* 108 S.Ct. at 1420–21 ("... we have explicitly overruled statutory precedents in a host of cases. These actions do not mean that the Court has been insensitive to considerations of *stare decisis*, but only that we recognize it as ' "a principle of policy and not a mechanical formula" ' " (citations omitted)).

The dissent's argument regarding the Supreme Court's obligation to follow *stare decisis* in cases involving statutory construction is an appealing one, but misplaced here.[2] Admittedly, it is important for the Supreme Court to adhere to its prior statutory interpretations in most instances, and particularly when it is considering statutes in which Congress has granted rights or protections to oppressed citizens. *See Patterson*, 108 S.Ct. at 1423 (Stevens, J., dissenting). Certainly, the Supreme Court should not lightly discard rights that have become a part of the social fabric of our nation, and which afford hope and faith to disadvantaged minorities. But the case before us bears little resemblance to those in which the Supreme Court has spoken of the need for adhering to its prior decisions.[3]

While I am sensitive to the concerns for *stare decisis* so ably expressed by Judge Wallace, there are a number of reasons why I find the dissent's reliance on that principle unpersuasive in this case. Foremost are the following: 1) there is a substantial difference between the role of this court and that of the Supreme Court, and 2) the factors that determine whether *stare decisis* precludes our reconsideration of an earlier decision do not warrant the use of that doctrine as a bar in this case.

The decisions cited in the dissent relate to the Supreme Court's obligation to follow *stare decisis*. Circuit courts do not have the same set of reasons for action and inaction as does the Supreme Court. While some of the considerations which affect the decision whether to discard a prior ruling are common to the Supreme Court and the intermediate appellate courts,[4] there are other considerations unique to the Supreme Court's decision-making that derive from the fact that it is the final arbiter of federal law. When the Supreme Court has spoken, its pronouncements become the law of the land. Those who wish to determine their actions on the basis of legal precedent can know with reasonable certainty that the final judicial answer has been given.

By contrast, the Ninth Circuit is an inferior court within the federal system, co-equal with eleven other circuit courts. Circuit courts establish the law in a particular geographical area—subject to whatever the Supreme Court ultimately decides. In instances in which the circuit courts are in agreement on the interpretation to be given a statute, there may well be validity to the notion that we should stand by our prior decision—at least in the absence of some compelling reason for reinterpreting the statute at issue. However, when there is a split in the circuits and strong disagreement exists as to a statute's meaning, I see

---

**2.** Also appealing and perhaps also misplaced here, is the portion of the twenty-four page dissent which heaps lavish praise on judicial writings that reflect "brevity" and "cogent terseness".

**3.** For example, only one of the Supreme Court cases relied on by the dissenting opinion is a criminal case, *Busic v. United States*, 446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980), and in that case the government sought to have the Court reinterpret a statute so as to increase the punishment permitted, i.e., to authorize the imposition of enhanced penalties on certain defendants. That the Court refused to do. Here, the issue is the opposite: whether *stare decisis* precludes us from adopting an interpretation of a criminal statute which is more lenient than our prior construction.

**4.** Justice Frankfurter's comments in his opinion for the Court in *Helvering v. Hallock*, 309 U.S. 106, 60 S.Ct. 444, 84 L.Ed. 604 (1940), are as applicable to circuit courts as to the Supreme Court:

This court, unlike the House of Lords, has from the beginning rejected a doctrine of disability at self correction.... Surely we are not bound by reason or by the considerations that underlie *stare decisis* to persevere in distinctions taken in the application of a statute which, on further examination, appear consonant neither with the purposes of the statute nor with this Court's own conception of it. *Id.* at 121–22, 60 S.Ct. at 452–53 (citation omitted).

*no* merit in basing our decision on a desire to maintain the precise division among the circuits (except possibly in cases in which persons within our circuit have relied to their detriment on an opinion of ours). Whether a split is 6–1 or 5–2, for example, is of little consequence; the important point is that the split exists. Disagreements among the circuits are likely to be resolved by the Supreme Court, as those who look to judicial decisions for guidance will be aware. Pending the definitive resolution of circuit conflicts, our duty, as a circuit court, is to offer our own best analysis and reasoned judgment, and to construe statutes as we think the law and the Constitution requires. This is a duty we owe the Supreme Court, *cf. McNally v. United States,* —— U.S. ——, 107 S.Ct. 2875, 2890, 97 L.Ed.2d 292 (1987) (Stevens, J., dissenting), as well as ourselves and the public.

Our interpretation of the Hobbs Act in *McClelland* was based almost entirely on the fact that at the time the panel heard the case, "[e]very circuit which ha[d] considered whether inducement is an essential element of a section 1951 violation ha[d] ruled that it is not." *McClelland,* 731 F.2d at 1439. While the panel's conclusory treatment of this difficult issue may be understandable given the consensus among the circuits at that time, the debate has since been joined by a thoughtful and persuasive *en banc* opinion of the Second Circuit. *See United States v. O'Grady,* 742 F.2d 682 (2nd Cir.1984) (en banc). After *O'Grady,* with circuit court decisions on both sides of the issue, it is reasonable for this court to give the matter a closer, more probing examination than we originally did, even if, as a result, we must acknowledge that our prior decision was in error. We should not allow an incorrect ruling to stand—particularly one that authorizes imprisonment of defendants for terms substantially in excess of the maximum prescribed by Congress—simply because at the time we initially decided the issue, the split in the circuits had not yet arisen.

Moreover, whatever deference this court should ordinarily give, for *en banc* purposes, to a prior decision of ours that determines, in a fully reasoned disposition, the proper interpretation to be given a statute, the brief *per curiam* opinion in *McClelland* deserves far less. *McClelland*'s analysis of a difficult statutory issue—an issue to which other circuit courts have devoted dozens of carefully reasoned pages—consists of only one paragraph containing a string-citation, one quotation, and a footnote. In this connection, it is worth noting that before the panel opinion in *Aguon,* no court, including ours, had seen reason to cite *McClelland,* for any purpose, in a published opinion.

Next, one of the primary justifications for adhering to earlier cases construing statutes has no force in the present context. A principal reason the Supreme Court has given for adhering to earlier interpretations is that persons will have relied on that interpretation and guided their actions by it. *See, e.g., International Longshoremen's,* 105 S.Ct. at 3058; *Tuttle,* 105 S.Ct. at 2434 n. 5. In the present case, this factor simply does not apply. People cannot be said to have relied to their detriment on our decision that certain corrupt practices are covered by both the Hobbs Act and the antigratuity statute, 18 U.S.C. § 201, rather than by just the latter statute (even those persons who in theory may have refrained from committing bribery because they thought the conduct they were contemplating was covered by two criminal statutes rather than one could not be said to have been prejudiced by their reliance on *McClelland* ). The Hobbs Act, as earlier interpreted and as re-interpreted by the majority opinion, confers no rights or protections on any persons. A change in our interpretation of the Act will not interfere with vested interests or undermine settled expectations. The only effect of today's ruling is to reduce the number of federal criminal laws a person violates by committing a single criminal act.

There is an additional reason for reconsidering and rejecting *McClelland.* Recently, the Supreme Court decided *McNally v. United States,* —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). *McNally* involved the interpretation of the federal mail fraud statute, 18 U.S.C. § 1341. Like

the Hobbs Act, the mail-fraud statute had been given a broad reading by a large number of circuit courts in connection with the prosecution of corrupt officials. Though the Courts of Appeals had been unanimous in holding that the mail fraud statute applied to schemes to "defraud citizens of their intangible rights", *McNally*, 107 S.Ct. at 2879; *see id.* at 2884 & n. 5 (Stevens, J., dissenting), the Supreme Court when it ultimately considered the statute gave it a far narrower reading. The Court confined the statute's reach to the clear meaning of its terms, saying:

> The Court has often stated that when there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language. As the Court said in a mail fraud case years ago, "There are no constructive offenses; and before one can be punished, it must be shown that his case is plainly within the statute." Rather than construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials, we read § 1342 as limited in scope to the protection of property rights. If Congress desires to go further, it must speak more clearly than it has.

*Id.* at 2881 (citations omitted). The principles of statutory construction the Court recently applied to the mail fraud statute are equally applicable to the provision of the Hobbs Act at issue here. Those principles clearly militate in favor of a narrow construction of the term "extortion". Thus, *McNally* strongly supports our decision to reconsider *McClelland en banc*, as well as the interpretation of the Hobbs Act we today adopt.

Before concluding, I should note that the issue for circuit courts is different from that confronting the Supreme Court from a procedural as well as a substantive standpoint. In the circuit courts, three-judge panels are ordinarily required to follow circuit precedent. Only an en banc court can normally overrule an earlier circuit decision.[5] Thus circuit courts must make two decisions in order to reject precedent: first, to go *en banc*,[6] and second, to overrule the earlier case.

A number of factors must be considered when we have gone *en banc* and are deciding whether to overrule precedent. Among them are the following: a) whether there is a split in the circuits, b) if not, how many circuits have considered the question, c) whether our prior opinion was a carefully reasoned disposition, d) whether all of the critical issues were considered in the earlier decision, e) how longstanding or well-established our precedent is, f) to what extent persons are likely to have relied to their detriment on our opinion, g) what is the nature of the issue, e.g., civil or criminal, civil rights or tax, h) whether our earlier opinion is in derogation of rights or protections to which individuals may be entitled, i) whether our earlier opinion entrenches on individual freedom or liberties, j) what legal developments have occurred in the intervening period, i.e., what cases have been decided or what statutes have

---

5. A three judge panel of this court is free, however, to reexamine a prior panel decision if an intervening decision of the Supreme Court or of an *en banc* panel makes such action necessary. *See, e.g., United States v. Maybusher,* 735 F.2d 366, 371 n. 1 (9th Cir.1984); *Heath v. Cleary,* 708 F.2d 1376, 1378 n. 2 (9th Cir.1983).

6. Under the Federal Rules of Appellate Procedure, determination of a matter *en banc* is appropriate when (1) it is "necessary to secure or maintain uniformity of [the court's] decisions, or (2) when the proceeding involves a question of exceptional importance." Fed.R.App.P. 35(a). A decision to go *en banc* to reconsider precedent may occur for one of two entirely different reasons: a) when the call for rehear-

ing *en banc* is based on the assertion that a prior holding should be overruled, and b) when the call is based on the assertion that a recent decision is in conflict with a prior decision of the court. In the first type of case, the court, when deciding whether to go *en banc*, is required to given some consideration to whether principles of *stare decisis* should preclude the *en banc* court from overruling the earlier case. In the second type, the court must consider whether a panel's decision violates that doctrine by disregarding an earlier binding precedent. In the case before us we went *en banc* because the panel opinion was in conflict with an earlier decision.

been enacted since we issued our earlier opinion, and finally, k) how firmly we are persuaded that our prior decision is incorrect.

Some of the factors listed above will be relevant in some cases. Others will be applicable in others. The mix will differ from case to case. As with so many of the recurring questions which plague judges, there is no simple answer, no mechanical formula that can resolve the question for us. In order to determine when *stare decisis* should govern, we must look to the relevant factors, weigh them and determine which are of particular importance under particular circumstances, and then attempt to place the rule in its proper perspective. For *stare decisis* is simply one of the principles which, along with a number of others, helps us to arrive at a lawful and just result. In the end, it is this weighing and evaluating of factors and principles, this exercise of our judgment, which constitutes the art of judging.

I would not attempt here to say which factors might outweigh which in particular instances or how the balance should be struck in particular cases. I would note, however, that while balancing will ordinarily be required, that will not always be the case. For example, if we are fully persuaded that we erred previously and if our erroneous decision will result in a continuing infringement on fundamental rights, we should not hesitate to change our prior ruling, regardless of where on the scale the other factors may fall.

In the present case, while the dissent's concern for the general well-being of the doctrine of *stare decisis* may be well-founded, the majority decision poses no threat to that principle. Our reconsideration of our prior erroneous ruling is justified by a number of the factors I have mentioned: the conclusory nature of our earlier *per curiam* opinion, the existing conflict in the circuits, the intervening Supreme Court decision and the nature of the statutory provision at issue; also, our prior decision is not one on which individuals have relied to their detriment. Finally, I do not believe a concern for the principle of *stare decisis*

could, under any circumstances, justify our affirming Mrs. Aguon's conviction for a crime that is not covered by the statute under which she is charged.

WALLACE, Circuit Judge, joined by Chief Judge GOODWIN and Circuit Judges BROWNING, NORRIS, and WIGGINS, concurring and dissenting:

I agree with the majority that the non-Hobbs Act counts should be affirmed. Although the lack of a trial objection leaves me somewhat in doubt, I could probably agree that Aguon's conviction for extortion under 18 U.S.C. § 1951 should be reversed, because the district court committed plain error in failing to give an appropriate instruction on the required specific intent. Established principles of *stare decisis*, however, prevent me from concurring in the majority's redefinition of "extortion" as that term has been used in the Hobbs Act, 18 U.S.C. § 1951(b)(2). The majority has overturned the settled interpretation of this and all but one other circuit on the meaning of "extortion" in the Hobbs Act. Prudential considerations that counsel against creating an intercircuit conflict, *see United States v. Chavez–Vernaza*, 844 F.2d 1368, 1374 (9th Cir.1988), also caution against going out of our way to inflame an incipient intercircuit conflict. "Our readiness to reconsider long-settled constructions of statutes takes its toll on the courts." *Commissioner v. Fink*, —— U.S. ——, 107 S.Ct. 2729, 2738, 97 L.Ed.2d 74 (1987) (*Fink*) (Stevens, J., dissenting).

The majority justifies upsetting our settled interpretation of section 1951 on three principal grounds. First, looking to the text of section 1951(b)(2), the majority suggests that an "accurate grammatical reading" of that provision imposes a requirement that the public officer somehow "induce" the donor into giving him property. Next, the majority purports to rely on the common-law definition of extortion and the legislative history surrounding the Hobbs Act to back up its grammatical construction. Last, the majority maintains that grafting an inducement requirement onto section 1951(b)(2) is necessary in order to distinguish "extortion" in that section from

"bribery" in 18 U.S.C. § 201. None of these grounds, however, singly or in combination, adequately justifies undermining the objectives of consistency and predictability in law that underlie the principle of *stare decisis* vital to our jurisprudence.

Adherence to the principle of *stare decisis* would have required the panel we are reviewing to decide the issue differently. When we earlier squarely confronted the meaning of "extortion" under the Hobbs Act in *United States v. McClelland*, 731 F.2d 1438, 1439–40 (9th Cir.1984) (per curiam) (*McClelland*), cert. denied, 472 U.S. 1010, 105 S.Ct. 2708, 86 L.Ed.2d 723 (1985), we resolved beyond doubt that inducement is *not* an essential element of a Hobbs Act violation. *See Aguon I*, 813 F.2d at 1423–29 (Poole, J., dissenting). Contrary to the panel's suggestion in *Aguon I*, the fact that *McClelland* did not spell out what is meant by "under color of official right" did not render its holding ambiguous or any less binding. *McClelland*'s clear and unequivocal command was that in prosecuting a public official acting "under color of official right" for violating section 1951, *"the government need not show inducement."* 731 F.2d at 1440. Had we believed that the prepositional phrase "under color of official right" implicitly required that a demand or inducement be made, we surely would have held otherwise. The divided panel chose not to follow this precedent, resulting in this en banc. I would follow *McClelland* and disagree with the majority in overruling it.

Values of consistency and predictability are especially important when, as in this case, we are construing a statute. Thus, "considerations of *stare decisis* weigh heavily in the area of statutory construction, where Congress is free to change this Court's interpretation of its legislation." *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736, 97 S.Ct. 2061, 2070, 52 L.Ed.2d 707 (1977); *accord NLRB v. International Longshoremen's Association*, 473 U.S. 61, 84, 105 S.Ct. 3045, 3058, 87 L.Ed.2d 47 (1985) (*Longshoremen's*); *Oklahoma City v. Tuttle*, 471 U.S. 808, 818 n. 5, 105 S.Ct. 2427, 2433 n. 5, 85 L.Ed.2d 791 (1985) (*Tuttle*). The doctrine of *stare decisis* is equally applicable to settled interpretations of a criminal statute. *See Busic v. United States*, 446 U.S. 398, 404, 100 S.Ct. 1747, 1752, 64 L.Ed.2d 381 (1980) (*Busic*) (invoking stare decisis to bar reinterpretation of a sentence enhancement statute).

Since the early 1970's, all of the circuits interpreting "extortion" under section 1951(b)(2), with one exception, have held that it does not require an act of inducement by a public official. *See, e.g., United States v. Swift*, 732 F.2d 878, 880 (11th Cir.1984), cert. denied, 469 U.S. 1158, 105 S.Ct. 905, 83 L.Ed.2d 920 (1985); *McClelland*, 731 F.2d at 1439–40; *United States v. Jannotti*, 673 F.2d 578, 594–96 (3d Cir.) (en banc), cert. denied, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982); *United States v. French*, 628 F.2d 1069, 1074 (8th Cir.), cert. denied, 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980); *United States v. Williams*, 621 F.2d 123, 123–24 (5th Cir. 1980), cert. denied, 450 U.S. 919, 101 S.Ct. 1366, 67 L.Ed.2d 346 (1981); *United States v. Butler*, 618 F.2d 411, 417–18 (6th Cir.), cert. denied, 447 U.S. 927, 100 S.Ct. 3024, 65 L.Ed.2d 1121 (1980); *United States v. Phillips*, 577 F.2d 495, 503 (9th Cir.) (*Phillips*), cert. denied, 439 U.S. 831, 99 S.Ct. 107, 58 L.Ed.2d 125 (1978); *United States v. Hall*, 536 F.2d 313, 320–21 (10th Cir.), cert. denied, 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285 (1976); *United States v. Hathaway*, 534 F.2d 386, 393–94 (1st Cir.) (*Hathaway*), cert. denied, 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976); *United States v. Price*, 507 F.2d 1349 (4th Cir.1974); *United States v. Braasch*, 505 F.2d 139, 151 (7th Cir.1974) (*Braasch*). The Second Circuit stands as the lone voice of dissent. *See United States v. O'Grady*, 742 F.2d 682, 687–89 (2d Cir.1984) (en banc) (*O'Grady*).

Under the prevailing interpretation, in the crime of extortion "under color of official right," the *actus reus* is the act of *taking, receiving,* or *accepting* the payment, even if such acts are wholly "passive." *See United States v. Holzer*, 816 F.2d 304, 311 (7th Cir.) (*Holzer*) (reaffirming the longstanding interpretation that even if the defendant were "the *passive* recipient of loans, pressed on him by law-

yers eager to curry favor with him," he would still be guilty of extortion because "[e]xtortion 'under color of official right' equals the knowing receipt of bribes; *they need not be solicited*") (emphasis added), *vacated on other grounds,* — U.S. —, 108 S.Ct. 53, 98 L.Ed.2d 18 (1987), *aff'd in part on remand,* 840 F.2d 1343 (7th Cir. 1988); *United States v. Paschall,* 772 F.2d 68, 71–73 (4th Cir.1985). The public office was viewed as either a surrogate for inducement or as a perpetual inducement in itself. *See id.* at 73–74 ("there are circumstances under which the [public] office itself provides the inducement"). Neither Congress nor the Supreme Court has ever seen fit, despite ample opportunity to do so, to overturn the line of authority developed nearly unanimously by the circuits.

The rule of *stare decisis* imposes a heavy burden on one who seeks to overturn a settled interpretation of a statute to show that the present interpretation leads to an irrational result or that it is founded upon implausible inferences as to congressional intent. *E.g., Busic,* 446 U.S. at 404, 100 S.Ct. at 1752. The majority has failed to overcome that burden. The interpretation of section 1951 by our circuit and all others but one accords with congressional intent to the extent that it is firmly grounded in the text of the statute and is consistent with at least one reasonable reading of its ambiguous legislative history. Moreover, this settled interpretation does not lead to irrational consequences. Under these circumstances, it is unfortunate that the majority would be attracted to the lone dissenting circuit and overturn an interpretation long established by circuit court precedent. By failing to follow a near unanimous interpretation of a statute that has governed the expectations of litigants for years without even an inkling of any contrary indication by either Congress or the Supreme Court, the majority has abandoned a principled stance toward *stare decisis.*

While concurring with the majority, Judge Reinhardt suggests a new reason, not adopted by the majority, to jettison precedent. He argues that *stare decisis* applies with less force in this case because

"the brief *per curiam* opinion in *McClelland* deserves far less" deference than "a fully reasoned disposition." Concurrence at 1174. The mere fact that *McClelland* was a brief opinion in comparison with many over-written dispositions does not subtract from either its thoroughness or persuasiveness. Length has never been a substitute for cogent terseness. Judicial brevity is certainly a virtue that ought to be encouraged. *McClelland* is no less persuasive because the panel in that case considered and was persuaded by the thoughtful analysis that was provided by our sister courts and chose to quote a particular concise, convincing passage from their opinions, rather than itself issuing a treatise-length exposition reiterating research and analysis that had already been performed several times over.

I

The majority begins its assault on our established precedents by reversing our longstanding grammatical construction of section 1951(b)(2). In *McClelland,* 731 F.2d at 1439–40, we unambiguously interpreted subsection (b)(2) in the disjunctive: "extortion" was defined as the obtaining of property from another, with his consent, (1) "induced by wrongful use of actual or threatened force, violence, or fear," or (2) "under color of official right." Under this interpretation, the verb "induced" is modified only by the first prepositional phrase, "by wrongful use of actual or threatened force, violence, or fear." We cited with approval the interpretation placed on section 1951(b)(2) by the First Circuit in *Hathaway,* 534 F.2d at 393:

> [A] disjunctive reading [of section 1951(b)(2)] comports with the historical development of the crime of extortion. The "under color of official right" language reflects the common law definition of extortion, which could be committed only by a public official's corrupt taking of a fee under color of his office and did not require proof of threat, fear, or duress.... The misuse of public office is said to supply the element of coercion.... Threats, fear and duress be-

came express elements only when the crime was later broadened to include actions by private individuals, who had no official power to wield over their victims. *McClelland,* 731 F.2d at 1439–40, *quoting Hathaway,* 534 F.2d at 393.

Section 1951(b)(2)'s plain language supports *McClelland*'s grammatical interpretation. Even if one believed that the plain language of section 1951(b)(2) was susceptible to the majority's interpretation, what sound authority does the majority cite for its proffered new reading? First, it relies on a recent First Circuit case that declares, without further explanation, that "[w]e have interpreted [the] definition [of section 1951(b)(2)] in the disjunctive, finding that the prosecution can establish a violation by showing that a defendant induced payment *either* through use of actual or threatened force, violence, or fear, *or* under color of official right." *United States v. Bucci,* 839 F.2d 825, 827 (1st Cir.1988). Curiously, however, the court in *Bucci* supported this statement with a citation to the First Circuit's prior decisions in *United States v. Kelly,* 722 F.2d 873, 875 (1st Cir.1983), *cert. denied,* 465 U.S. 1070, 104 S.Ct. 1425, 79 L.Ed.2d 749 (1984), which adopted the disjunctive construction that we affirmed in *McClelland.* Moreover, I question *Bucci*'s reading in of the word "either" into section 1951(b)(2), because nowhere in that section does the word "either" appear.

The other support for the majority's reinterpretation of section 1951(b)(2) is a student law review comment. *See* Comment, *Prosecuting Public Officials Under the Hobbs Act: Inducement as an Element of Extortion Under Color of Official Right,* 52 U.Chi.L.Rev. 1066 (1985). Although law students have made contributions by their writings, I suggest that only with studied hesitation should a court use a law student's efforts to uproot the settled expectations fostered by a longstanding judicial interpretation of a statute. The student comment admits that the legislative history sheds "little light" directly on congressional intent, but relies instead on the premise that Congress intended to adopt the common law definition of extortion, which, according to the student, does require inducement. *See id.* at 1081–82. While it does question the judgment of the circuit courts, it does so mainly on the basis of the author's own conclusory statements regarding the proper grammatical construction of section 1951(b)(2) and on a comparative reading of the Hobbs Act with the federal bribery statute—a mode of analysis I will discuss and reject later.

## II

For institutional reasons I am troubled by the majority's willingness to reexamine our prior interpretation of the Hobbs Act. Neither the legislative history of section 1951(b)(2) nor the common law definition of extortion, which the majority maintains Congress took from the New York Penal Code, compel the conclusion that Congress intended to require inducement by the official. Given this lack of legal certainty, the long legacy of judicial interpretation requires that we retain the interpretation so long as the prior interpretation is reasonably defensible in light of the statute's plain language and legislative history.

The Supreme Court and many commentators have concluded that, at common law, extortion was defined as the corrupt *taking* or *receipt* of an unlawful fee by a public officer under color of office. *See United States v. Nardello,* 393 U.S. 286, 289, 89 S.Ct. 534, 536, 21 L.Ed.2d 487 (1969); W. LaFave & A. Scott, *Handbook on Criminal Law* § 95, at 704 (1972); R. Perkins, *Criminal Law* 367 (1969); 4 *Wharton's Criminal law,* § 695, at 481; § 698, at 484 (C. Torcia ed. 1981). On their face, the words in this definition do not require inducement. Nor in their discussion of common-law extortion did either the Supreme Court or the treatise-writers allude to any requirements of "inducement" or "demand" by the public officer. Apparently the sole *actus reus* required for conviction was the taking of an illegal fee.

I recognize that recently, commentators have debated whether common law extortion required an implicit demand by the public official. *Compare* Stern, *Prosecution of Local Political Corruption Under*

*the Hobbs Act: The Unnecessary Distinction Between Bribery and Extortion*, 3 Seton Hall L.Rev. 1, 14–17 & accompanying notes (1971) (*Stern*) (common law extortion requires only an unlawful "taking" of money by a public official) *with* J. Noonan, *Bribes* 564–91 (1981) (common law extortion requires a demand by a public official). This difference of academic opinion, however, does not help in deciding whether to overturn widely accepted precedent. Academics need not concern themselves with *stare decisis.* We must. Thus, I reject the majority's reliance on the more recent commentary that redefines common law extortion contrary to established case law.

Nor am I persuaded by the majority's reliance on the New York Penal Code as an authoritative interpretation of the meaning of extortion in the Hobbs Act. The New York statute was derived from the Field Code, *see* Bergan, "David Dudley Field: A Lawyer's Life," in *The Fields and the Law* 35, 48 (1986), which defined extortion in language nearly identical to that used in the Hobbs Act. Commissioners of the Code [Proposed], Penal Code of the State of New York, tit. XV, ch. VI, at 220–22 (1864) (Field Code). Quite telling is the fact that the official comment to the Field Code expressly adopted the meaning of "extortion under color of official right" that was articulated in a New York case which observed that extortion "signifies the taking of money by any officer." *See* Field Code, tit. XV, ch. VI, § 613 at 220, official comment, *citing People v. Whaley*, 6 Cow. 661, 663–64 (1827). Contrary to the majority's suggestion, *ante* at 1164 n. 2, the fact that the jury in *Whaley* had found that the defendant had "received and demanded the money by color of his office," *id.* at 664, does not alter *Whaley*'s holding that extortion requires only the act of *"taking* of money by any officer by color of his office." *Id.* at 663 (emphasis added). In accordance with its proper task, the court in *Whaley* was simply applying what it obviously believed to be a settled rule of law to the facts of the case before it. By condemning the mere taking of money by public officials, the rule of extortion that was announced in *Whaley* happened also to

encompass conduct that was preceded by a demand. This, however, does not change the rule itself. I disagree, therefore, with the majority that a "demand" was required as far back as 1827 to convict a person of extortion. *Ante* at 1164 n. 2. For the majority to suggest such a reading of *Whaley* is to confuse the facts of a case with the rule of law announced in its holding.

The definition of extortion in the Field Code, the prototype for the New York Penal Code, was enacted unchanged as part of the New York Penal Code of 1881. *Compare* Field Code, tit. XV, ch. VI, § 613 at 220, *with* N.Y.Penal Code, tit. XV, ch. V, § 552 at 139 (1881). More important, however, the New York Penal Code added a provision expressly clarifying the meaning of "Extortion committed under color of official right": "A public officer who asks, or receives, or agrees to receive, a[n illegal] fee or other compensation for his official service ... Commits extortion." N.Y.Penal Code, tit. XV, ch. V, § 557 at 140 (1881). This provision defining extortion under color of official right in the New York Penal Code *was in force when the Hobbs Act was passed.* It is thus clear that the New York statute's use of the disjunctive language "asks, *or* receives, or agrees to receive" eliminates any doubt that a public officer who merely *receives* an illegal payment is guilty of extortion. If the majority is correct that congressional intent should be determined by reference to the New York Penal Code's definition of extortion, *see ante* at 1164–65, then the majority's holding is squarely at odds with Congress's intent in enacting the Hobbs Act.

In spite of the clear and unequivocal language of New York Penal Code § 557, the majority insists that section 557 must implicitly require a demand. *See ante* at 1165 n. 3. The majority attempts to explain its reason by posing a question: "Why would someone pay an illegal fee in excess of the statutory amount other than in response to some form of demand having been made?" *Ante* at 1165 n. 3. The answer is simple: to secure a desired result. Suppose it is believed that a public official will respond favorably to a license

application with an added payment. An applicant tenders the required statutory fee plus an additional sum, unsolicited by the official, and accompanied by a wink of the eye. While this may commonly be considered bribery, as I will demonstrate shortly, extortion under section 1951 encompasses many instances of bribery and vice-versa. But this simple hypothetical discredits the majority's suggestion that because no person would "pay an illegal fee in excess of the statutory amount other than in response to some form of demand having been made," New York Penal Code § 557 must implicitly require a demand before one can be convicted of extortion under color of official right.

I also remain unconvinced by the internal legislative history upon which the majority relies. The only internal legislative history that the majority recites is isolated statements of various congressmen who debated the bill that became the Hobbs Act. When read in their proper context, however, these remarks indicate that the debaters were interested only in that branch of extortion that forbade force, or threats of force, by private individuals. They were concerned with extortion "under color of official right" only to the extent that courts might construe it to cover the acts of union representatives. *See, e.g.,* 91 Cong.Rec. 11,900 (1945) (statements of Cong. Hancock); 89 Cong.Rec. 3228–29 (1943) (statements of Cong. Day); 89 Cong.Rec. 3228–29 (1943) (statements of Cong. Hobbs); *Stern* at 2–3. Hence, the internal legislative history of the Hobbs Act is no aid to the interpretation of the meaning of extortion "under color of official right."

While I believe that both the core common-law concept of extortion and the definition of official extortion in the New York Penal Code confirms our prior interpretation of the Hobbs Act, my purpose in referring to this countervailing interpretation of the relevant historical texts is not to engage the majority in an academic debate. Legal historians are better equipped to wage this battle than are federal judges confronted with a live controversy. If the interpretation of section 1951 were before us for the first time, we would have little

choice but to become embroiled in this debate and to resolve it for the limited purposes of defining extortion in the Hobbs Act. We are not, however, confronted with an issue of first impression. Rather, we approach this case informed and constrained by a long legacy of judicial interpretation. "[A]fter a statute has been construed, either by [the Supreme] Court or by a consistent course of decision by other federal judges ..., it acquires a meaning that should be as clear as if the judicial gloss had been drafted by Congress itself." *Shearson/American Express, Inc. v. McMahon,* — U.S. ——, 107 S.Ct. 2332, 2359, 96 L.Ed.2d 185 (1987) (Stevens, J., concurring and dissenting) (*Shearson/American Express*). Especially in questions of statutory interpretation, " '[s]tare decisis is usually the wise policy because in most matters, it is more important that the applicable rule be settled than that it be settled right.... That is commonly true, even where the error is a matter of serious concern, provided correction can be had by legislation.' " *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 424, 106 S.Ct. 1922, 1931, 90 L.Ed.2d 413 (1986) (*Square D Co.*) *quoting Burnet v. Coronado Oil & Gas Co.,* 285 U.S. 393, 406, 52 S.Ct. 443, 447, 76 L.Ed. 815 (1932) (Brandeis, J., dissenting).

Thus, it is clear that the historical background and legislative history is at least inconclusive on the meaning of "extortion" under the Hobbs Act. Because we were reconsidering a long-established interpretation of a statute, I suggest that the sole purpose of the majority's historical excursion under the circumstances of this appeal should have been to ascertain whether the existing interpretation of extortion in section 1951(b)(2) is *reasonably* defensible in light of the Hobbs Act's internal and external legislative history, equivocal though it may be. *Stare decisis,* after all, is the *presumption* in matters of statutory interpretation. *Longshoremen's,* 473 U.S. at 84, 105 S.Ct. at 3058; *Square D Co.,* 476 U.S. at 424 & n. 34, 106 S.Ct. at 1930 & n. 34. Hence, only if it appears beyond doubt from the legislative history that our prior

cases have misapprehended congressional intent should we depart from their interpretation of a statute. *See Monroe v. Pape,* 365 U.S. 167, 192, 81 S.Ct. 473, 486, 5 L.Ed.2d 492 (1961) (Harlan, J., concurring) (*Monroe*).

When confronted with the interpretation of a statute that has been fixed by years of judicial interpretation, our role is not one of a court construing a statute in the first instance. The mere fact that the majority's interpretation may be preferable to the view that prevailed for years is not sufficient reason for changing the law. *See Shearson/American Express,* 107 S.Ct. at 2359 (Stevens, J., concurring and dissenting). Rather, our task is limited to determining if there is a compelling reason to overturn a settled construction upon which litigants have come to rely. *See Thomas v. Washington Gas Light Co.,* 448 U.S. 261, 272, 100 S.Ct. 2647, 2656, 65 L.Ed.2d 757 (1980); *Busic,* 446 U.S. at 404, 100 S.Ct. at 1752. This limited inquiry assists us in maintaining uniformity, consistency, and predictability in the law. Reasonable expectations and patterns of conduct have developed around this longstanding interpretation. *See Tuttle,* 471 U.S. at 818 n. 5, 105 S.Ct. at 2433–34 n. 5. We do a great disservice by disturbing these expectations and "maintain[ing] the law in a state of flux." *Id.*

While I agree with Judge Reinhardt that one important reason for following a prior interpretation of a statute is that people "will have relied [to their detriment] on that interpretation and guided their actions by it," concurrence at 1174, such expectations are but one reason to defer to *stare decisis.* Equally important is the notion of fostering stability in the law. *See, e.g., Boys Market, Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235, 240, 90 S.Ct. 1583, 1587, 26 L.Ed.2d 199 (1970) (*Boys Market*) ("important policy considerations militate in favor of continuity and predictability in the law"); *Helvering v. Hallock,* 309 U.S. 106, 119, 60 S.Ct. 444, 451, 84 L.Ed. 604 (1940) (*Helvering*) ("*stare decisis* ... represents an element of continuity in law"). By abandoning our interpretation of the Hobbs Act in *McClelland,* the majority destabilizes the

law, yet vindicates no fundamental civil rights of citizens. Indeed, Judge Reinhardt ignores the fact that the majority's decision undermines the expectations of the law-abiding citizens that they will have a government free of corruption. Those who are tempted to misuse a public office for personal gain will now have one less disincentive against doing so.

One cannot say with any conviction that the history of extortion is clear and unambiguous. Reasonable minds can differ as to which conclusion the weight of historical data points in this case. Surely, not even the majority can believe that the historical data compels reexamining the settled rule. Rather than narrowly focusing on the reasonableness of our prior interpretation, as I believe it should have, the majority lost sight of our limited objective and, instead, decided that the preponderance of the historical data favors a result contrary to that reached by all but one of the circuits. Any longstanding, near-uniform interpretation of a statute by the courts of appeals is entitled to great weight, even by an en banc court. Our goal in interpreting a statute is to divine and give meaning to Congress's intent. The fact that neither Congress nor the Supreme Court has ever questioned a settled interpretation by the circuit courts is evidence that it is consonant with congressional intent.

In his concurring opinion, Judge Reinhardt submits that, as a circuit court, we have less of an obligation to follow *stare decisis* than the Supreme Court. I suggest that this vision of the relative importance of *stare decisis* to our decisions stands logic on its head. An erroneous interpretation of a statute by a circuit court can be corrected not only by Congress, but also by the Supreme Court. By contrast, an erroneous reading of congressional intent by the Supreme Court can be remedied only by an affirmative act of Congress. It is not surprising that the concurrence fails to cite a single authority in support of its reasoning. Moreover, I disagree with the suggestion that, so long as a split among the circuits exists, "[w]hether a split is 6–1

or 5–2 ... is of little consequence." Concurrence at 1173. Although there may be some disagreement among the courts as to a rule of law, parties will endeavor to conduct their affairs according to the weight of authority. Until this decision, the split in the circuit courts was at least 9 to 1 in favor of our interpretation of the Hobbs Act in *McClelland.* Would-be venal officials and diligent prosecutors would certainly rely on the interpretation of the overwhelming number of circuits, regarding the lone maverick decision of the Second Circuit as an anomaly. The majority's about-face will only inject confusion and doubt into a statute whose meaning was heretofore clear. When this court "stands alone, *or virtually so,* against a tide of well-considered opinions issued by ... federal courts," its judgment "is most suspect." *McNally v. United States,* — U.S. —, 107 S.Ct. 2875, 2890, 97 L.Ed.2d 292 (1987) *(McNally)* (Stevens, J., dissenting) (emphasis added).

Nor can I accept Judge Reinhardt's theory that principles of *stare decisis* carry greater force when we are protecting the existing rights of individuals than when we are vindicating the rights of the public, as enforced through the government. *See* Concurrence at 1173, 1176. No authority is cited for this bold proposition. The Supreme Court, in fact, has rejected the suggestion that a given interpretation of a statute "should not be subject to the same principles of *stare decisis* as other decisions ... [if] it benefited civil rights plaintiffs." *Patterson v. McLean Credit Union,* — U.S. —, 108 S.Ct. 1419, 1421, 99 L.Ed.2d 879 (1988) *(Patterson ).*

While I agree with Judge Reinhardt that *stare decisis* is " 'a principle of policy and not a mechanical formula,' " concurrence at 1173, *quoting Patterson,* 108 S.Ct. at 1421 (citations omitted), the case before us presents no compelling reason to revisit our prior interpretation of section 1951(b)(2). Our prior interpretation is not manifestly contrary to the intent of Congress. On the contrary, it comports with the plain language of the statute. Adherence "to an interpretation of technical statutory lan-

guage that has been followed consistently ... is the wisest course when the language of the statute provides arguable support for the settled rule." *Fink,* 107 S.Ct. at 2734 n. 4 (Stevens, J., dissenting). Moreover, this interpretation is eminently reasonable in light of its historical context and its legislative history, which in itself counsels in favor of strict adherence to *stare decisis.* *See Lee v. Florida,* 392 U.S. 378, 388–89, 88 S.Ct. 2096, 2102–03, 20 L.Ed.2d 1166 (1968) (Harlan, J., dissenting) (the interpretation of a statute that has existed for fifteen years should not be changed in the absence of convincing evidence that the original interpretation misconstrued Congress's intent); *Monroe,* 365 U.S. at 192, 81 S.Ct. at 486 (Harlan, J., concurring). Finally, neither the majority nor the concurrence has demonstrated that our preexisting interpretation of the Hobbs Act in *McClelland* "involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience," *Helvering,* 309 U.S. at 119, 60 S.Ct. at 451, nor that *McClelland* "stands as a significant departure from our otherwise consistent emphasis upon [some well-established] congressional policy." *Boys Market,* 398 U.S. at 241, 90 S.Ct. at 1587.

No one is alleging that the prior interpretation was void for vagueness, that it failed to provide fair notice, or that it was otherwise unconstitutional. Well-established precedent, both in this and in other circuits, served to put Aguon on notice that she could be prosecuted under section 1951, even without a single instance of inducement on her part. Nor can I discern even the most tenuous policy in favor of reinterpreting a statute so as to benefit those officials who would breach the public trust in order to line their own pockets. Principles of *stare decisis* permit us to stray from an established interpretation of a statute only "in the most egregious cases." *Cottrell v. Commissioner,* 628 F.2d 1127, 1131 (8th Cir.1980) (en banc). Under the circumstances of this case, where a statute's long-established meaning is reasonably supported by both its text and legislative history, and where no countervailing legal or policy considerations tip the scales,

it is far too late in the day for the judiciary to be reinventing the wheel. *McClelland's* interpretation of extortion under section 1951(b)(2), which requires no "inducement" when committed by a public official acting "under color of official right," should therefore remain the law of this circuit.

### III

Finally, the majority attempts to bolster its new interpretation by examining other provisions in Title 18 aimed at official misconduct. Reading section 1951 in conjunction with these other provisions, reasons the majority, suggests that we should interpolate an inducement requirement into extortion "under color of official right." As I understand the majority's reasoning, grafting such a requirement onto section 1951 promotes consistency and proportionality in punishment, and prevents overlap in coverage among the provisions of Title 18. *Ante* at 1166–67. Promoting consistency and proportionality and preventing overlap, argues the majority, also incidentally places a check on what would otherwise be overbroad prosecutorial discretion. *Id.* at 1167.

The flaw in the majority's reasoning is that Congress often does not prescribe punishments that are intended to be entirely self-consistent and proportionate to the magnitude of the crime. Nor is it the province of the courts, as I see it, to impose their own vision of what is a self-consistent set of laws on society when Congress has suggested an alternative vision. "[I]n our constitutional system the commitment to the separation of powers is too fundamental for us to pre-empt congressional action by judicially decreeing what accords with 'common sense and the public weal.'" *Busic*, 446 U.S. at 410, 100 S.Ct. at 1755, *quoting TVA v. Hill*, 437 U.S. 153, 195, 98 S.Ct. 2279, 2302, 57 L.Ed.2d 117 (1978). Moreover, Congress often condemns the same conduct under two or more non-mutually exclusive criminal statutes.

Using the language of the divided panel in *Aguon I*, which quoted the Second Circuit's opinion in *O'Grady*, 742 F.2d at 691, the majority argues that "the enactment of the antigratuity statute[, 18 U.S.C. § 201,] in 1962 was 'a clear indication that Congress did not believe that the Hobbs Act prohibits such conduct.'" *Ante* at 1165. Factually, this premise is incorrect. Congress had enacted precursors to section 201 that predated the Hobbs Act or its progenitor by a quarter of a century.[1] Enactment of the antigratuity statute in 1962 merely consolidated and clarified much of what were formerly sections 201–18 of the 1948 version of Title 18. *See* S.Rep. No. 2213, 87th Cong., 2d Sess. 2, *reprinted in* 1962 U.S.Code Cong. & Admin.News 3852, 3853 (section 201 is a "substitution of a single comprehensive section of the Criminal Code for a number of existing statutes concerned with bribery ... [which] would make no significant changes of substance"). It would appear then that the substance of section 201 was the law long before Congress enacted the predecessor to section 1951. Correction of this factual

---

1. Section 202 of Title 18 (Act of June 25, 1948, ch. 645, § 202, 62 Stat. 691), for example, which was in turn based on the *1909* version of Title 18 (Act of Mar. 4, 1909, ch. 321, § 117, 35 Stat. 1109) provided that:

Whoever, being an officer or employee of, or person acting for or on behalf of the United States, in any official capacity, under or by virtue of the authority of any department or agency thereof, or an officer or person acting for or on behalf of either House of Congress, or of any committee of either House, or of both Houses thereof, asks, accepts, or receives any money, or any check, order, contract, promise, undertaking, obligation, gratuity, or security for the payment of money, or for the delivery or conveyance of anything of value, with intent to have his decision or action on any question, matter, cause, or proceeding which may at any time be pending, or which may by law be brought before him in his official capacity, or in his place of trust or profit, influenced thereby, shall be fined not more than three times the amount of such money or value of such thing or imprisoned not more than three years, or both; and shall forfeit his office or place and be disqualified from holding any office of honor, trust, or profit under the United States.

Section 1951, which was initially enacted in the 1948 version of Title 18 (Act of June 25, 1948, ch. 645, § 1951, 62 Stat. 793), consolidated what originated as sections 420a–420e–1 of the *1934* version of Title 18 (Act of June 18, 1934, ch. 569, §§ 1–6, 48 Stat. 979, 980).

premise should logically lead the majority to an opposite result.

Implicit in the majority's desire to read an inducement requirement into official extortion under section 1951 is its belief that, without such a requirement, section 1951, as it applies to public officials, will be completely subsumed by "bribery" under section 201. By interpreting section 1951 as criminalizing official extortion even absent an inducement by the public official, however, we would not be rendering it redundant with section 201. The two acts are not coextensive. While section 201 applies by its terms only to *federal* officers, *see* 18 U.S.C. § 201(a)(1), section 1951 applies to state and local officers, as well as federal officers, and to private actors who resort to force, violence, fear, or threats thereof, so long as their extortionate conduct affects interstate commerce. *See* 18 U.S.C. § 1951(a), (b)(2). Moreover, section 1951's plain language forbids the obtaining of property by public officers through means other than bribery. *See* 18 U.S.C. § 1951(b)(2). Further, where as section 1951 criminalizes only the actual obtaining of property, that is, a *completed* bribe, *see* 18 U.S.C. § 1951(b)(2), section 201 punishes even a mere demand or unconsummated agreement to accept a bribe. *See* 18 U.S.C. § 201(b)(2).

Although our prior interpretation of section 1951 may have rendered unsolicited bribe-taking by a federal officer under section 1951 redundant with section 201, the majority's revision suffers the same fate because the type of official misconduct that it views as extortion remains subject to redundant coverage by sections 201 and 1951. Under the majority's holding, a federal officer who *demanded,* or otherwise affirmatively sought, and obtained a bribe would be guilty of extortion under section 1951(b)(2). *See ante* at 1167. Such an official, however, would also be equally guilty of bribery under section 201(c)(1)(B), which provides that "[w]hoever ... being a public official, ... otherwise than as provided by law for the proper discharge of official duty, directly or indirectly *demands, seeks,* receives, accepts, or agrees to receive or accept anything of value personally for or because of any official act performed or to be performed by such official or person ... shall be fined under this title or imprisoned for not more than two years, or both." (Emphasis added.) Hence, to the extent that the majority's reversal of our precedents was impelled by a felt need to distinguish extortion from bribery, its decision has failed to accomplish that end.

That solicited bribes under the majority's reasoning are punishable under section 201 as bribery or section 1951 as extortion completely eviscerates the majority's contention that Congress would not have enacted separate statutes for bribery and extortion if the two statutes penalized the same conduct. Indeed, the mere fact that section 201 applies by its express terms to public officials who *demand* or otherwise *seek* a bribe—conduct that the majority avers is the paragon of "extortion"—reaffirms those prior decisions recognizing that "bribery and extortion as used in the Hobbs Act are not mutually exclusive." *Hathaway,* 534 F.2d at 394; *accord Phillips,* 577 F.2d at 502; *Braasch,* 505 F.2d at 151 & n. 7. I find the majority's argument particularly disturbing because the scope of section 1951's prohibited conduct and covered actors is far from coextensive with that of section 201. Moreover, the majority's insistence on distinguishing extortion from bribery ignores the many striking instances in which Congress has chosen to punish the identical conduct under two or more labels, each carrying a different level of punishment. Addressing an analogous situation involving federal firearms control legislation, the Supreme Court in *United States v. Batchelder,* 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979) (*Batchelder*), acknowledged "the partial redundancy of [18 U.S.C.] §§ 922(h) and 1202(a), both as to the conduct they proscribe and the individuals they reach." *Id.* at 118, 99 S.Ct. at 221. Nonetheless, the Court held that a previously convicted felon who was found guilty of receiving a firearm that had traveled in interstate commerce could be properly convicted under either section 922(h), carrying a maximum penalty of five years'

imprisonment, or section 1202(a), which carried only a two-year maximum sentence. *See id.* at 116–18, 99 S.Ct. at 2200–01. In so holding, the Court expressly rejected the claim that the rule of lenity applicable to criminal statutes permitted the defendant to be convicted only under the less harsh statute.

While the majority ultimately concedes as it must that under federal law, "[b]ribery and extortion will still overlap in some situations," *ante* at 1166, it continues to insist that extortion requires proof of inducement, *ante* at 1165, 1166 based on its earlier assertion that the Hobbs Act was modeled after New York law. From its reading of three New York cases, the majority concludes that (1) New York law recognized that inducement was an essential element of extortion under color of official right, *ante* at 1165, and (2) New York law "accepted extortion as a defense to a charge of bribery." *Ante* at 1167.

None of the three New York cases that it cites, however, involve extortion "under color of official right." Rather, they all deal with extortion by *private* individuals who obtained property not "under color of official right," but through "wrongful use of force or fear." *People v. Dioguardi*, 8 N.Y.2d 260, 203 N.Y.S.2d 870, 873, 879–81, 168 N.E.2d 683, 685, 690–91 (1960); *Hornstein v. Paramount Pictures, Inc.*, 22 Misc.2d 996, 37 N.Y.S.2d 404, 407–09 (N.Y. Sup.Ct.1942), *aff'd*, 266 A.D. 659, 41 N.Y.S. 2d 210 (1943), *aff'd*, 292 N.Y. 468, 55 N.E. 2d 740 (1944) (union officials and other private citizens sought to extort payments from employers by threatening to call for a ruinous strike unless the employers succumbed to their demands for tribute); *Simpson v. Coastwise Lumber & Supply Co.*, 239 N.Y. 492, 147 N.E. 77, 78–79 (1925) (a former employee was indicted for extortion when he agreed to withdraw charges and accusations of fraud against his erstwhile employer in exchange for $5,000). Extortion through "wrongful use of force or fear," by its express language, necessarily denotes some form of inducement.

This brings me to the second grounds on which the majority bases its desire to distinguish extortion from bribery. Focusing on the maximum punishment available under sections 201 and 1951, the majority is disturbed by what it perceives as inconsistent penalties. Under the majority's reading of section 201, accepting an unsolicited bribe could subject a federal officer to two years' imprisonment. Charging this official for the same crime under section 1951 could, however, result in a twenty-year jail sentence. Such a wide disparity in punishment for the same conduct, the majority assumes, could not have been so intended by Congress absent "clear and definite language." *See ante* at 1167. Further, the majority suggests that this wide disparity in sentences between sections 201 and 1951 paves the way to excessive prosecutorial discretion. The majority also reasons that Congress must have intended extortion to require a higher threshold of culpability than bribery, and to impose maximum allowable penalties commensurate to this greater culpability. *See id.* This line of reasoning is based on false premises.

First, as previously pointed out, the majority accepts the proposition that an official who *solicited* a bribe would be subject to the apparent inconsistency of receiving either a two-year sentence for bribery or a twenty-year sentence for extortion. *See id.* at 1166. This conclusion belies the majority's subsequent assertion that Congress could not have intended to sanction such wide-ranging prosecutorial discretion or such a disparity in potential penalties for the same crime. *See id.* at 1167. Moreover, I doubt whether Congress intended a greater punishment under section 1951 because it believed that money taken pursuant to a demand was more objectionable than money passively accepted. Section 201, after all, punishes *all* bribes in the same way, whether or not they were solicited. By punishing *all* bribes equally, whether solicited or gratuitous, Congress has obviously rejected the majority's belief that "[p]ublic officials who tell members of the public that favors are for sale commit a more serious offense than those who accept unsolicited payments." *Ante* at 1167. I find it equally plausible that Congress could have chosen to impose a greater pen-

alty for extortion simply because conviction under section 1951 requires a *completed* bribe, whereas one can be convicted of bribery under section 201 merely for demanding a bribe or agreeing to accept one, regardless of whether the transaction was ever consummated. In addition, convicting an official of extortion under section 1951 requires a showing that the extortionate act "obstructs, delays, or affects [interstate] commerce or the movement of any article or commodity in [interstate] commerce." 18 U.S.C. § 1951(a), (b)(3). The important point here is that by struggling to find consistency in its tandem reading of sections 201 and 1951, the majority is speculating as to Congress's intent. I suggest that before a court discards years of settled precedent on the meaning of a statute, it should rely on more than conjecture as to Congress's intent.

The majority also implicitly attributes to Congress a conscious intent to define crimes and prescribe their appropriate punishment in a consistent and proportionate fashion. I doubt, however, that we should view congressional enactments as a self-consistent whole. For statutes to constitute a consistent body of law, they must be part of an interlocking network of directives. Here, the crimes of bribery and extortion find their way into many unrelated statutes in distant chapters of Title 18 which focus on wholly different concerns. Even if irrational or inconsistent patterns of sentencing were to result from our prior reading of section 1951, that consequence flows from the statutes as drafted by Congress, and it is Congress that must take corrective action. *See Busic*, 446 U.S. at 404–05, 100 S.Ct. at 1752. Congress, furthermore, has often seen fit to make the same conduct punishable under two different criminal statutes, with disparate levels of punishment. Which statute to pursue in a particular case is a decision that is inherently committed to the sound discretion of the prosecutor. Hence, a prosecutor has the discretion to charge a man who has taken another's life for aggravated battery, rather than for murder, and thus spare him the greater sentence. Or a prosecutor can elect to charge a drug

dealer with separate counts of possession, rather than with racketeering under RICO, thereby shunning RICO's severe criminal forfeiture provisions. Similar examples abound of Congress choosing to criminalize the identical conduct under two statutes carrying substantially different penalties and leaving, as it must, the decision of which avenue to pursue to prosecutorial discretion. Yet, the Supreme Court has never been troubled with the prosecutorial discretion that exists when two criminal statutes, each carrying significantly different penalties, govern the same conduct. *See, e.g., Batchelder*, 442 U.S. at 124–25, 99 S.Ct. at 2204–05 (rejecting in the context of 18 U.S.C. §§ 922(h) and 1202(a) the argument that "when two statutes prohibit 'exactly the same conduct,' the prosecutor's 'selection of which of two penalties to apply' would be 'unfettered,'" thereby posing a threat of "'unequal justice'"). Moreover, a decision by a prosecutor to proceed under section 1951 "does not empower the Government to predetermine ultimate criminal sanctions. Rather, it merely enables the sentencing judge to impose a longer prison sentence than" section 201 would permit. *See id.* at 125, 99 S.Ct. at 2205. Consequently, just because conviction under section 1951 can result in a twenty-year jail term, compared with a two-year term under section 201, is no reason to infer that Congress intended extortion to be a more reprehensible crime than mere bribery.

The majority's focus on the lack of symmetry in maximum sentences between sections 201 and 1951 also ignores that if one takes into account other provisions of Title 18 pertaining to bribery and extortion, the range of allowable sentences for a given act of bribery or a given act of extortion is comparable to the disparity between sections 201 and 1951. Under section 201(c)(1)(B), for example, a public official who "receives, accepts, or agrees to receive or accept anything of value personally for *or because of an official act performed or to be performed by such official* or person ... shall be fined under this title or imprisoned for not more than *two* years, or both." (Emphasis added.) But under section

201(b)(2)(A), a public official who "corruptly ... receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, *in return for ... being influenced in the performance of any official act* ... shall be fined not more than three times the monetary equivalent of the thing of value, or imprisoned for not more than *fifteen* years, or both, and may be disqualified from holding any office of honor, trust, or profit under the United States." (Emphasis added.) Hence, any public official who passively receives a bribe in order to influence his performance of any official act can be sentenced to either a two-year or a fifteen-year maximum prison term. The result will depend in part on which subsection of the antigratuities act the prosecutor decides to charge the official. Unless the majority is willing to assail the potential thirteen-year differential in punishment that exists within section 201 itself, I do not see on what grounds the majority can complain of the potential eighteen-year disparity between section 201(c)(1)(B) and section 1951.

Indeed, if this venal public official above is indicted under section 201(b)(2)(A), any ostensible disparity in punishment relative to section 1951 virtually evaporates. Conviction under section 201(b)(2)(A) can result in a maximum *cumulative* penalty of (1) a fine of three times the monetary value of the bribe, with no ceiling on the amount, (2) a fifteen-year sentence, and (3) disqualification from holding federal office, presumably for life. By contrast, conviction under section 1951 can lead to a maximum fine of $10,000 and a twenty-year sentence; disqualification from public office is not an available option under the terms of the statute.

Moreover, section 1951 belongs to chapter 95 of Title 18, which is explicitly aimed at racketeering. In 1961, Congress added to chapter 95 the Travel Act, 18 U.S.C. § 1952, which prohibits, among other things, traveling in interstate or foreign commerce for the purposes of committing extortion. Violations of section 1952 can result in a fine of up to $10,000 and *five* -years' imprisonment. *See* 18 U.S.C.

§ 1952(a). Congress was undoubtedly aware at the time that the Hobbs Act, which is part of the same chapter in Title 18 as the Travel Act and immediately precedes it in the United States Code, punishes extortion by a fine up to $10,000 and *twenty* -years' imprisonment. That Congress willingly chose to visit inconsistent deprivations of liberty upon government officials who commit extortion, as evidenced by its juxtaposition of the Hobbs Act and Travel Act, further discredits the majority's implicit assumption that Congress would not knowingly subject the same crime to two different statutes providing for unequal penalties.

I am perplexed by the majority's reliance on the old federal extortion statute, 18 U.S.C. § 872, which makes it a crime for any officer of the United States, "under color of office," to commit or attempt "extortion." *Ante* at 1164. Borrowing the analysis in *Aguon I*, the majority declares that the Seventh Circuit has reasoned that, because "the statute uses a term already contained in the common law meaning of extortion, ... Congress must have meant to require more—the commission of official acts which brought pressure on the one subject to them. *United States v. Sutter*, 160 F.2d 754 (7th Cir.1947)." *Id.* Although the majority appears to characterize *Sutter*'s holding accurately, it is difficult to see how the interpretation of a completely different statute bears on the interpretation of section 1951. Just because "extortion" in section 872 requires some element of coercion by the public official does not mean that "extortion" in section 1951 requires inducement. The two statutes are not parallel. They are not part of the same chapter. *Sutter* was decided in 1947 before the Hobbs Act was passed in 1948. If, as the majority asserts, section 872, as interpreted in *Sutter*, "emphasizes" the necessity for proof of demand in a prosecution for extortion, *see ante* at 1164, then under the majority's reasoning, the passage of the Hobbs Act in 1948 was an exercise in redundancy. Overlapping coverage could then be avoided if the Hobbs Act were construed as dispens-

ing with a requirement of a "demand" or other form of inducement. Unfortunately, the majority does not so construe the Hobbs Act.

In addition, the majority's reliance on section 872 puts it in a difficult position vis-a-vis its concern over redundant statutes and its arguments predicated on avoiding inconsistent penalties. Section 872 punishes the extortion of sums not exceeding $100 by a paltry fine of no more than $500 and one-years' imprisonment. *See* 18 U.S.C. § 872. Hence, the same corrupt federal official who demands and receives a payoff can be sentenced to either a one-year jail term under section 872 or a twenty-year jail term under section 1951. If Congress is willing to subject such a corrupt public official to prosecutorial discretion which can result in a difference of nineteen years of liberty, how can the majority object to a fifteen year difference between sections 201(c)(1)(B) and 1951?

Scrutinized under its own microscope, the majority's reinterpretation of section 1951 does not alleviate its concerns over inconsistent penalties and overbroad prosecutorial discretion. Even within the very statute that the majority cites in defense of its new reading of section 1951, greater disparities in potential penalties and correspondingly broader prosecutorial discretion exist than between "extortion" under section 1951 and "bribery" under section 201(c)(1)(B). By providing for widely dissimilar penalties for the same act of "extortion" under different statutes, Congress has demonstrated that it is not loath to exposing venal public officials to inconsistent penalties.

Because Congress, through this extensive statutory scheme aimed at public corruption, has obviously permitted venal public officials to be punished either for bribery or extortion, the reasons for narrowly construing a criminal statute that the Supreme Court announced in *McNally*, 107 S.Ct. 2875, 2881, have no force in the present context. In *McNally*, the Supreme Court narrowed the construction that the lower federal courts had placed on the federal mail fraud statute, 18 U.S.C. § 1341.

But as Judge Reinhardt observes in his concurring opinion, concurrence at 1175, the Court in *McNally* reversed the lower court's holding that the mail fraud statute applied to schemes to "defraud citizens of their intangible rights," because that interpretation extended liability beyond the plain meaning of its terms. *See id.* at 2880. Equally important, the lower court's interpretation of a certain key term in the statute was at odds with both a prior construction of that very term by the Court, *see id.* at 2880-81, and with Congress's act of codifying an earlier Supreme Court case suggesting that the statute protected only tangible property rights. *See id.* at 2879-80. Unlike the present case, moreover, in which Congress has clearly chosen to criminalize many of the same acts of public corruption under two or more statutes, the Court in *McNally* found that there was no evidence that Congress had ever intended to criminalize the act of defrauding people of their intangible rights. *See id.* at 2880-81. Therefore, contrary to Judge Reinhardt's suggestions, *McNally* neither "militate[s] in favor of a narrow construction of the term 'extortion'" nor "supports our decision to reconsider *McClelland en banc.*" *See* Concurrence at 1174-1175.

## IV

The settled interpretation of "extortion" under the Hobbs Act comports with both the common law and with the statute's plain language, and finds ample support in its legislative history. Neither Congress nor the Supreme Court has ever intimated that this interpretation is incorrect. Such a confluence of factors exhorts us to adhere faithfully to the doctrine of *stare decisis*. Accordingly, I would uphold the district court's instructions to the jury that the *actus reus* essential to the crime of extortion "under color of official right" does not require proof of any form of inducement.

After delving into the common-law background and legislative history of section 1951, the majority still has not conclusively resolved this question of statutory construction. Principles of *stare decisis* dictate that we not disturb a consistent, estab-

lished interpretation of a statute except in exceptional circumstances. When a case like this one provides grounds for decision that permit us entirely to avoid addressing a difficult question of statutory interpretation, prudence joins hands with *stare decisis* to enjoin us from needlessly revisiting the question. Because the majority holds that the convictions for extortion in this case can be reversed solely on the grounds that the district court failed to instruct on the requisite *mens rea,* the majority's discussion of whether the predicate act requires inducement was both unnecessary and unfortunate.

Thus, the majority has gone out of its way to overturn a long-settled interpretation of section 1951 embraced by all but one circuit—an interpretation that is in harmony with its plain language, historical background, and legislative history, and that has not been questioned in the slightest by either Congress or the Supreme Court. The majority justifies its departure from established precedent on the basis of (1) its grammatical construction of section 1951(b)(2), for which it cites no persuasive authority; (2) a digression into the statute's murky common-law underpinnings and scant legislative history, which proved to be inconclusive at best; and (3) a comparison of the penalties available under the Hobbs Act with those of the antigratuities act, which serves only to undercut the very position that the majority takes.

Principles of *stare decisis* inform us that a settled interpretation of a statute should be disturbed only in the face of overwhelming evidence that we had previously misconstrued Congress's intent. The majority, however, can barely marshal a tenuous, much less compelling, case for breaking from precedent. To jettison our precedent and join the lone dissenting circuit can only result in an unnecessary destabilization of the law. It is difficult not to conclude that the majority's decision to part company with the prevailing interpretation of the Hobbs Act reveals itself as an expression of what the majority feels should be an element of the crime of extortion, not of what Congress believed back in 1948. I

therefore respectfully dissent from part II of the majority's opinion.